# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 65

APRIL TERM, A.D. 2020

May 28, 2020

ROGER KEITH BLACK,

Appellant
(Defendant),

v.

S-19-0153

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Sheridan County*
*The Honorable William J. Edelman, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Timothy P. Zintak, Assistant Attorney General. Argument by Mr. Zintak.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS, Chief Justice**.

[¶1]    Roger Black was charged with and convicted of one count of conspiracy to deliver a controlled substance and four counts of delivery of a controlled substance based on transactions with a confidential informant.  He appeals the district court's refusal to instruct the jury on his entrapment theory of defense.  We conclude that the evidence was sufficient to warrant the requested instruction and reverse.

## ISSUE

[¶2]    Mr. Black presents a single issue on appeal, which we restate as:

> Did the district court err when it refused to instruct the jury on Mr. Black's entrapment defense?

## FACTS[1]

[¶3]    Tabitha Charles worked as a confidential informant (CI) for the Wyoming Department of Criminal Investigation (DCI) from September 1, 2017 through October 2017.  As a CI, she was paid to make controlled drug purchases in the Sheridan area, and in that period, made eight to ten controlled purchases of methamphetamine and earned seven to eight hundred dollars.[2]

[¶4]    DCI initially directed Ms. Charles to make controlled purchases from a target named Linda Bradford.  On or around September 24, 2017, Ms. Charles attended a party at Ms. Bradford's home, and Ms. Bradford introduced her to Roger Black.  Mr. Black then became a DCI target when Ms. Charles informed DCI that he had told her that if she was unable to get methamphetamine from Linda Bradford, he could obtain it for her.[3]

[¶5]    On September 25, 2017, at around 2:00 in the afternoon, Ms. Charles placed a call to Mr. Black and asked to purchase a hubcap for $150.[4]  She made the call while at DCI

---

[1] These facts are taken from the testimony and recorded buys admitted into evidence at Mr. Black's jury trial.  They are presented in the light most favorable to Mr. Black in accordance with our standard of review, which requires that we view the evidence in the light most favorable to a defendant who is refused a theory of defense instruction.  *Garza v. State*, 2020 WY 32, ¶ 18, 458 P.3d 1239, 1243 (Wyo. 2020) (quoting *James v. State*, 2015 WY 83, ¶ 18, 357 P.3d 101, 105 (Wyo. 2015)).

[2] When she made these controlled purchases, DCI would search Ms. Charles to ensure that she had no drugs or cash on her person and would then provide her with cash to buy drugs from targets of DCI's investigations.  DCI also outfitted her with a transmitter and monitored and recorded the controlled purchases, and also maintained mobile surveillance.

[3] The record does not tell us the circumstances of the conversation between Ms. Charles and Mr. Black, who initiated the discussion of obtaining methamphetamine, or what precisely was said.

[4] A hubcap is code for one gram of methamphetamine.

1

headquarters and with DCI monitoring the call. Mr. Black said he would need a minute and would give her a holler.

[¶6]    Mr. Black called Ms. Charles back at 4:10 that afternoon. She was still in the DCI office when she received the call, and it was again monitored and recorded. Mr. Black informed her that he struck out at the first place, but that he had one more place he could try. He told her he needed to know how many hubcaps she wanted, to which she responded that it depends on the "car place" he goes to and that she has $150 if he will cover the cost of a hubcap for her. He told her that he did not have the money to cover it, and she swore in response. He then asked if she wanted to go along, and she agreed to meet him at his home in five minutes.

[¶7]    After they met, the two drove to a dog park to wait for Mario Watt, the person from whom Mr. Black hoped to buy the methamphetamine. Ms. Charles asked Mr. Black if he was disappointed in her for wanting the drugs, and he responded that he had "been there, done that," and also that it would "be better if you didn't do it." A little later, Mr. Black asked her, "Why do you want to get so much for anyway?" As they continued to wait for Mr. Watt, they had the following exchange:

> Black: But, I'm going to tell you right now, I mean, I want you for my fucking self, period, I do …
>
> Charles: Okay.
>
> Black: I mean, that's it, and uh, if it don't happen, I'll still be your friend, you know. And that's it, in a nutshell.
>
> Charles: In a nutshell … [inaudible] [laughter]
>
> Black: [Laughter] I figured you already knew that. What'd you think, anyway, did you know that already? Of course you did?
>
> Charles: Well, kind of. I mean, you said you had motives, and I assumed your motives.
>
> Black: And it ain't just the, fucking, I mean, I like you, I just not to have sex, period, that's it. You know, it's like …
>
> Charles: Oh. [Laughter] It's not? Or it is?
>
> Black: Not only.
>
> Charles: Oh, okay. I was like 'what'? [Laughter]

2

Black: [Laughter]

Charles: Fuck, Sally, don't be too straightforward, okay?

Black: But you know that I'm saying, a little more than that, you know? [Laughter]

Charles: Yeah.

[¶8] Mr. Watt eventually showed up at the dog park but did not have any methamphetamine, and Mr. Black and Ms. Charles left the park to return to Mr. Black's apartment. On the way, he stopped at another location to see if he could find someone to sell him methamphetamine but found no one there. At that point, he stated, "Can't think of anyone else offhand," and returned to his apartment. Before they parted ways, Ms. Charles asked, "You'll just call me," to which Mr. Black responded, "If that's what you want." They continued to talk, with Mr. Black expressing doubt that she would return after leaving his apartment and her assuring him that he would see her again and that she was hoping that he would get a call.

[¶9] Ms. Charles returned to the DCI office and was searched and returned the buy money. Later that evening, Mr. Black called her and told her that he was able to get some methamphetamine for her. DCI again fitted her with a wire and gave her money to make the buy. She then went to Mr. Black's apartment and paid him $100 for what turned out to be 1.2 grams of methamphetamine. Before he gave her the methamphetamine, he expressed his reluctance because her mother was proud of her for not using drugs, but also said that she was a grown woman who could decide for herself. Later in the conversation, she asked why he would not get high with her, and he responded, "I'm trying to be good." She pressed again, stating, "Come on, Roger, please," and he responded, "Please don't do that." When she eventually left, she told him she would return to stay the night at his apartment.

[¶10] Ms. Charles returned to the DCI office where she was searched and turned over the 1.2 grams of methamphetamine and the remaining fifty dollars of the buy money. She did not return to Mr. Black's apartment that evening.

[¶11] Ms. Charles was in contact with Mr. Black again concerning the possibility of buying methamphetamine in late September or early October, and she learned that he had been able to purchase a gram of methamphetamine and might be able to obtain two eight balls for her.[5] At 1:30 p.m. on October 2, 2017, Ms. Charles met with DCI and was again fitted with a wire and given money to purchase methamphetamine from Mr. Black. During that buy, she obtained seven-tenths of a gram of methamphetamine. She also talked with him about getting the two eight balls and about her financial troubles and need for money.

---

[5] An eight ball is an eighth of an ounce or 3.5 grams of methamphetamine.

She told him that she wanted to get the eight balls through him and not through Linda Bradford, and that she had an extra $100 if she was able to do it through him. Toward the end of their conversation, she told him she just needed to do one or two more buys to pay off her fines, and then she would be able to go to Florida with him. He said he was not sure if he could get the eight balls but that he would check with a couple of people.

[¶12] Later that same day, at about 5:30 p.m., Mr. Black contacted Ms. Charles and told her he might be able to buy two eight balls of methamphetamine for her through Mario Watt. Ms. Charles contacted DCI and was once again fitted with a wire and given $500 in buy funds. Mr. Black picked her up at her home, and they drove to the same dog park they had earlier visited. While they waited at the dog park, Mr. Black took a call and then told Ms. Charles "he doesn't have it." Mr. Black then said they might not be able to get the methamphetamine, and he and Ms. Charles briefly argued, because she believed he had definitely said he could obtain it. He told her that "nothing's a sure thing," and that all he had said was, "I bet I know who can hook us up." He then said, "Hopefully this guy will come through."

[¶13] They continued to wait in Mr. Black's vehicle at the dog park, and he again called his source, who said he would be down. While they continued to wait, Mr. Black and Ms. Charles had the following exchange:

> Black: Hey, I didn't even have to like coax you, or anything, that last kiss you gave me. That was fucking nice. You just kissed me.
>
> Charles: Yep.
>
> Black: That was good.

[¶14] Shortly after that, Ms. Charles asked Mr. Black if he had the $500 to cover the buy, and he responded that he did not. They went back and forth on whether she would front him the money to make the buy, and she instructed him to drop her off at her mother's house, that she would give him the money to make the buy, and that she would tell her mother that she was going to stay the night with him. When he asked her what she wanted him to get, she told him that she would prefer eight balls, but if he can only get grams, then he should obtain those. He dropped her off and returned about forty minutes later with what he called four good grams, which later weighed in at five grams with the baggie. Ms. Charles then told him that she would come over to his house in about an hour and that she had told her mom that she was going to stay the night there. After he left, DCI agents picked her up, and she turned the drugs over to them. She did not return to Mr. Black's home that evening.

4

[¶15]  On October 12, 2017, Ms. Charles met with DCI agents and informed them that she believed that she would be able to purchase additional methamphetamine from Mr. Black, again through Mario Watt.  She was again fitted with a wire and given buy funds.  The controlled buy took about five hours and was originally called off after four hours because Mr. Black had been unable to make contact with Mr. Watt.  At that point Ms. Charles told Mr. Black that the buy was off.  She returned to DCI and was searched, the wire was removed, and the buy funds were returned.

[¶16]  About eight minutes later, Mr. Black called Ms. Charles and told her that he had been able to reach Mario Watt, and the deal was on.  Ms. Charles was again searched, fitted with a wire, and provided buy funds.  She then walked to her house and waited outside for Mr. Black to pick her up.  After he picked her up, he told her she could not go to the buy with him, and they drove for several minutes before he dropped her at a gas station to wait for him.  During that drive, he told her that he would not do the deal if, as they had discussed, the price was too high.  They then had the following exchange:

> Charles: For $600, I better not get anything less than fucking six grams.
>
> Black: So if he says five and a half grams, you don't want it? I'm just being real here. You know, I'm just saying for instance.
>
> Charles: If I get fucking five and a half grams, I'm gonna be pissed, but I'll take it.  [Laughs] Just saying.
>
> Black: Okay. Now don't be pissed so pissed that you leave me straight for three or four days and not give me no gas money no more. Okay? I'm gonna need some gas money.
>
> Charles: As long as you fucking help me out, I'll help you out.
>
> Black: Okay I will. What the fuck the deal is? What the fuck? I ain't getting nothing out of this shit. I'm committing a fucking felony for you.
>
> Charles: You are not committing nothing because nobody's fucking going to say a fucking word.

[¶17]  Mr. Black returned about thirty minutes after dropping Ms. Charles at the gas station.  He told her, "I did the best I could for you," and gave her what later weighed in at six grams of methamphetamine with the baggie.  He then told her, "Take care of your tickets, don't worry about me."  As they parted, Ms. Charles promised to see him later.

She was then picked up by DCI and was searched and turned over the drugs. She did not go to Mr. Black's home that evening.

[¶18] Mr. Black was arrested on October 31, 2017, and the State filed an information charging him with one count of conspiracy to deliver a controlled substance and four counts of delivery of a controlled substance. Before trial, he asserted entrapment as his theory of defense and requested that the jury be instructed with the criminal pattern instruction on entrapment.

[¶19] A jury trial was held December 19-21, 2018, and after both parties rested, Mr. Black renewed his request for an entrapment instruction. The State objected to the instruction. It did not argue that Mr. Black was predisposed to commit the charged crimes, but instead claimed there was no evidence of extraordinary temptation or inducement that would warrant the giving of the instruction. Defense counsel responded:

> Well, Your Honor, I think that the opposite is the case.
>
> I think there's been testimony that she solicited these buys.
>
> There's been testimony that she asked Black to use drugs with her.
>
> There's been testimony that she lied repeatedly to get him to use drugs.
>
> There were at least, not inducements, but suggestions [to] have a romantic or sexual relationship.
>
> There's evidence that at least on one occasion Mr. Black declined to use drugs with her and encouraged her not to use drugs.
>
> So, I think this – the Court has some discretion in this matter, certainly.
>
> But I believe that this is evidence that Mr. Black did not have a stash of drugs ready and waiting to deliver to people.
>
> So, I think in this matter, the evidence is – is sufficient to at least give the instruction, Your Honor.

[¶20] The district court refused Mr. Black's entrapment instruction. It explained:

The Court is well familiar with the law of entrapment in the State of Wyoming.

And the Supreme Court has repeatedly held that a mere offer to purchase does not constitute sufficient evidence to warrant an entrapment instruction.

The Court's recollection of the testimony is that Ms. Charles was introduced to Mr. Black through a third person who was also a purveyor of methamphetamine.

It does not appear in the record that that introduction was generated at the behest of the State. Instead, it was just sort of a happenstance sort of occurrence.

It was after that that Ms. Charles approached the Defendant and requested controlled substances.

There does not appear to be any sort of extraordinary effort on the part of the State to tempt Mr. Black into providing that controlled substance.

There were no promises made.

There was no indication by Ms. Charles that she had offered to purchase the drugs at a rate greater than the going rate of methamphetamine.

There is no testimony to establish that she made any representations that Mr. Black would receive anything other than money in exchange for the controlled substances.

And so at this time I find that there is insufficient evidence to warrant instructing the jury on entrapment.

The defense clearly will be able to argue about the credibility of Ms. Charles, given her testimony. But I am going to decline to instruct the jury on that subject.

[¶21]   The jury returned a verdict of guilty on all counts, and the district court sentenced Mr. Black to concurrent prison sentences of ten to fifteen years on each count. Mr. Black filed a timely notice of appeal to this Court.

7

## STANDARD OF REVIEW

[¶22]   "The failure to give an offered instruction on the law related to a theory of defense is a due process issue, which this Court reviews de novo." *Hopkins v. State*, 2019 WY 77, ¶ 18, 445 P.3d 582, 588 (Wyo. 2019) (quoting *Tingey v. State*, 2017 WY 5, ¶ 27, 387 P.3d 1170, 1178 (Wyo. 2017)).   An erroneous refusal of a theory of defense instruction is "reversible error per se." *Swartz v. State*, 971 P.2d 137, 139 (Wyo. 1998) (quoting *Oien v. State*, 797 P.2d 544, 549 (Wyo. 1990)); *see also United States v. Ortiz*, 804 F.2d 1161, 1163-64 (10th Cir. 1986) ("This right is so important that the failure to allow a defendant to present a theory of defense which is supported by sufficient evidence is reversible error.").   We have also said:

> Any competent evidence is sufficient to establish a defense theory even if it consists only of testimony of the defendant. *Best v. State*, 736 P.2d 739, 745 (Wyo. 1987). We view the evidence in a light favorable to the accused and the accused's testimony must be taken as entirely true to determine if the evidence is competent. *Duckett v. State*, 966 P.2d 941, 944 (Wyo. 1998). Even if the court deems the evidence to be weak, or unworthy of belief, the instruction must be given if a jury could reasonably conclude the evidence supports the defendant's position. *Id*.

*Garza*, ¶ 18, 458 P.3d at 1243 (quoting *James*, ¶ 18, 357 P.3d at 105); *see also Harnetty v. State*, 2019 WY 21, ¶ 29, 435 P.3d 368, 374 (Wyo. 2019) ("We review whether there is 'competent' evidence to support a proposed theory of defense applying the same standard we apply to review sufficiency of the evidence appeals.") (citing *Bruce v. State*, 2015 WY 46, ¶ 80, 346 P.3d 909, 932-33 (Wyo. 2015)).

## DISCUSSION

[¶23]   "Entrapment law serves the purpose of ensuring that a defendant is not punished who, but for government encouragement, would not have committed an offense." *Nelson v. State*, 2010 WY 159, ¶ 15, 245 P.3d 282, 286 (Wyo. 2010) (citing *Rivera v. State*, 846 P.2d 1, 4 (Wyo. 1993)).   Wyoming follows a subjective theory of entrapment, *Rivera*, 846 P.2d at 3, which requires a two-part inquiry.

> The defense has two related elements: 1) government inducement of the crime, and 2) a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). The threshold question is whether the

police somehow induced the defendant to act illegally or merely provided an opportunity to commit the crime. *Rivera v. State*, 846 P.2d 1, 3 (Wyo.1993). Once it is determined that inducement is involved, the defendant's predisposition comes into question. *Id*.

*Swartz*, 971 P.2d at 140.

[¶24] "Once a credible entrapment defense is raised, the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant was not entrapped." *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005) (quoting *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992)); *see also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.8(f)(4) (3d ed. Oct. 2019 update) ("[O]nce the defendant's threshold responsibility is satisfied (even if by evidence introduced during the prosecution's case-in-chief), the burden is then on the government to negate the defense by showing beyond a reasonable doubt defendant's predisposition or an absence of inducement.") (footnotes omitted). Where the evidence of entrapment is conflicting, the question is one for the jury. *Nelson*, ¶ 22, 245 P.3d at 287 (citing *LaFleur v. State*, 533 P.2d 309, 314 (Wyo. 1975); *Montez v. State*, 527 P.2d 1330, 1332 (Wyo. 1974)).

> The quantum of evidence required to submit an entrapment defense to a jury has been described as "any evidence," "some evidence," "slight evidence," and "more than a scintilla." We believe these phrases are not useful because the ultimate test is whether the evidence (regardless of amount) creates a fact issue requiring submission to the jury.

*Ortiz*, 804 F.2d at 1166 n.4.

[¶25] We turn then to whether the evidence created a fact issue on the questions of inducement and predisposition.

## A. <u>Inducement</u>

[¶26] Concerning the question of inducement, we have said:

> Entrapment does not arise where one is ready to commit the offense, given but the opportunity. *Higby v. State*, 485 P.2d 380, 384 (Wyo. 1971). Suspected persons can be tested by being offered an opportunity to transgress the law; however, they may not be put under any extraordinary temptation or inducement. *Id*. With respect to what constitutes undue persuasion or enticement, the question is not one of laying a

trap or trickiness or deceit, but one of seduction or improper inducement to commit a crime. *Swartz*, 971 P.2d at 140. Inducement may arise from persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship. *Id*.

*Nelson*, ¶ 15, 245 P.3d at 286.

[¶27]   Viewed in the light most favorable to Mr. Black, the evidence showed that he was interested in a romantic relationship with Ms. Charles, which the State does not dispute. Viewed in that same light, that evidence could potentially persuade jurors that Ms. Charles played on that desire to induce him to find and obtain methamphetamine for her.   For example, after nearly every buy or attempted buy, she assured him that she would return to spend time or the night with him.   On one occasion, she told him she would go to Florida with him after one or two more buys, and apparently on at least one occasion she kissed him.   She in fact admitted that she intended to induce him to obtain the methamphetamine by leading him on when she testified that "Part of the lifestyle of – or living in the lifestyle of drugs is to, I hate to say it, but to lead people on, so that you can get what you want in that life."   Viewing the evidence as our standard of review requires, we must conclude that the evidence created a fact issue for the jury on the question of inducement.

[¶28]   We are not persuaded otherwise by the cases on which the State relies, as they either support giving the issue to the jury or are distinguishable.   For example, in *United States v. Young*, 954 F.2d 614 (10th Cir. 1992), the following occurred:

> The Internal Security Division of the Internal Revenue Service (IRS) placed a female undercover informant, Jacqueline McSwane, at an IRS automated collection service site in Englewood, Colorado, to assist in an investigation of suspected illegal drug activity at the site. Defendant was employed by the IRS at Englewood and became acquainted with McSwane. In a telephone conversation, defendant told McSwane that he liked to smoke marijuana, and McSwane responded that she too liked to smoke marijuana. During the next four months, defendant and McSwane discussed the availability of marijuana. Some time later McSwane, acting under the direction of the government, offered to sell defendant a large amount of marijuana. Defendant agreed to purchase some marijuana and then arranged for another party, Rosa Casillas, to purchase nine pounds. Defendant told Casillas that the marijuana cost $900 per pound for nine pounds when in fact the cost was $800 per pound. Defendant intended to use the deception to acquire a tenth pound of marijuana for himself at

10

no cost. The sale went off as planned, and defendant and Casillas were in the process of leaving to get money for an additional fifteen pounds when they were arrested.

*Young*, 954 F.2d at 615-16.

[¶29] The issue in *Young* was not whether the jury should have been instructed on the entrapment defense. The trial court gave the instruction but denied the defendant's motion for a judgment of acquittal, by which he had asserted he was entrapped as a matter of law. *Young*, 954 F.2d at 615. In upholding the lower court, the Tenth Circuit agreed that "there was sufficient evidence to create a question of fact for the jury regarding the defense of entrapment." *Id*. at 617. Given that the facts in *Young* arguably reflect less evidence of inducement and more of predisposition, which we discuss below, we fail to see how it supports refusing an entrapment instruction in this case. Instead, the decision confirms the minimal evidence required to support an entrapment instruction.

[¶30] The State also directs us to *United States v. Elder*, 90 F.3d 1110, 1135 (6th Cir. 1996), in which the court found no evidence to support an entrapment instruction where an informant had a sexual relationship with the defendant. The decision is factually distinguishable. In *Elder*, the defendant was a managing member of a Florida gang involved in a wide range of criminal activities, and the evidence showed that he had been involved in those activities long before he met the informant. *Id*. That type of evidence is entirely absent from the record before us. Moreover, while the Sixth Circuit also found that Elder's transactions with the informant preceded any sexual relationship between the two, the court did not announce a bright line rule that a physical relationship must be consummated before an improper inducement may be found. *Id*.

[¶31] *United States v. Cuervelo*, 949 F.2d 559, 567 (2nd Cir. 1991), which the State cites for the proposition that a showing must be made that the government "consciously set out to use sex as a weapon in its investigatory arsenal," is likewise distinguishable. *Cuervelo* concerned an outrageous government conduct defense, not an entrapment defense. That defense "examines neither the defendant's predisposition to commit the crime nor the likely effect of police conduct on [the defendant]" and instead focuses purely on the conduct of the police as it affects the fairness of the charges. *Rivera*, 846 P.2d at 4. The holdings in *Cuervelo* therefore do not restrict the circumstances under which a defendant may assert an entrapment defense.

[¶32] In sum, the State's reliance on the above cases and the others cited in its brief to support the refusal of an entrapment instruction is misplaced. The cases simply do not change the fact that only minimal evidence is required to support a defendant's request for a theory of defense instruction. The question is not whether Mr. Black proved his case for government inducement, but is instead whether the evidence was sufficient to create a fact issue to be decided by a properly instructed jury. *Nelson*, ¶ 27, 245 P.3d at 288. The

answer to that question is yes, so we turn to the question of Mr. Black's predisposition to commit the crimes.[6]

## B. Predisposition

[¶33] Predisposition is determined by "looking to the totality of circumstances involved in the particular transactions in question." *Janski v. State*, 538 P.2d 271, 276 (Wyo. 1975).

> In asking whether a defendant was "predisposed" to a certain crime, we ask about his "inclination to engage in the illegal activity . . . [his] read[iness] and willing[ness] to commit the crime." *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992). The necessary inclination, this court has said, may be suggested by evidence of the "defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation." *United States v. Fadel*, 844 F.2d 1425, 1433 (10th Cir. 1988).

*United States v. Dykes*, 718 F.3d 1282, 1291-92 (10th Cir. 2013); *see also Janski*, 538 P.2d at 275 (quoting Anno., *Entrapment-Narcotics Offense*, 33 A.L.R.2d 886, § 3) (looking to whether defendant "offered to make a sale prior to any solicitation, or was willing to do so, as shown by ready complaisance").

---

[6]We also note that the fact that there were multiple transactions between Mr. Black and Ms. Charles does not provide a basis to take the question of inducement from the jury. Where there is evidence of "closely connected transactions without any intervening events, a jury question may be present as to whether the subsequent transaction arose from the government's inducement of prior transactions." *Nguyen*, 413 F.3d at 1180. The question is whether the evidence shows "a factual distinction between defendant's manifested state of mind during those [multiple] transactions." *Id.*; *see also Sherman v. United States*, 356 U.S. 369, 374, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958) ("It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement."); *United States v. Beal*, 961 F.2d 1512, 1517 (10th Cir. 1992) ("Because the two counts were founded upon one continuous course of conduct, it follows that the original inducement which 'beguiled' [the defendant] carried over to the second charge."). Here, the record contains evidence that from the first transaction through the final one, Mr. Black had a continuing romantic interest in Ms. Charles. In the first attempted buy, he openly expressed his feelings for her, and in the final buy, he stated that he was committing a felony for her, declined to take gas money from her, and urged her to use any sale proceeds to pay her outstanding fines. In turn, she repeatedly told him she would spend the night with him and on at least one occasion told him she would go to Florida with him. There is thus at least some evidence from which the jury could find that each transaction was motivated by the original inducement of a relationship with Ms. Charles, and that Mr. Black's state of mind did not change in that respect over the course of the transactions.

[¶34] The question before us is again whether the record contains sufficient evidence to create an issue of fact concerning Mr. Black's predisposition to commit the crimes. In that regard, when we view the record in Mr. Black's favor, it shows that: he twice expressed his view that Ms. Charles should not do methamphetamine; he questioned why she needed so much methamphetamine; he declined to take methamphetamine with Ms. Charles due to his desire to avoid a parole violation; he did not have a ready supply of methamphetamine available to sell or even a ready and reliable supplier; he did not have a ready supply of cash to purchase the methamphetamine; he felt he was committing a felony for Ms. Charles; and he did not profit from the transactions with Ms. Charles.

[¶35] The Tenth Circuit has cited the same or similar factors as relevant to the question of predisposition.

> Throughout his testimony, Sgt. Mayes reiterated that at no time did Mr. Beal appear reluctant to deal with him or otherwise indicate Mr. Beal's actions were not the product of his free will. Mr. Silva, however, repeated statements made to him by Mr. Beal that he was not dealing in "dope," and that he was working and going to school. Indeed, Mr. Silva testified that after the second transaction, Mr. Beal stated, "You know, Roger, I'm not selling dope. I done this as a favor to you."

*Beal*, 961 F.2d at 1515. By footnote, the court added:

> Made clear in the evidence are several other facts. First, at no time did Mr. Beal have methamphetamine in his possession to sell. Second, the purchase money received from Sgt. Mayes was given by Mr. Beal to a third person. Third, no evidence was produced showing defendant took money for himself. Fourth, Mr. Beal's only source of drugs was through Bob, who was not always able to deliver the requested substance. While these facts are not dispositive, they do bear on the question of Mr. Beal's predisposition to deal in controlled substances.

*Id.* at 1515 n.4.

[¶36] While this case and *Beal* do not line up factor for factor, the similarities illustrate the factual dispute concerning Mr. Black's predisposition to commit the crimes here. In particular, Mr. Black stated he was obtaining the methamphetamine and getting nothing out of it, suggesting he was doing it as a favor to Ms. Charles. For the larger purchases, he gave Ms. Charles' funds directly to a third person, and there is no evidence he profited

13

from any of the transactions.[7]  Additionally, like the defendant in *Beal*, Mr. Black did not seem to have a particularly ready and reliable source of methamphetamine, often needing to try multiple sources and commenting that he was not sure what he could get, if anything. Given this record, we must conclude that Mr. Black made the required minimal showing that a question of fact existed as to whether he was predisposed to commit these crimes.

[¶37]  The State nonetheless contends that the question was not one for the jury.  It asserts that Mr. Black volunteered to obtain the methamphetamine for Ms. Charles and that that act of volunteering conclusively established his predisposition to commit the crimes.  In support, it points to the testimony of an officer involved in the controlled buys and to Ms. Charles' testimony.   The officer testified, "Ms. Charles informed us that, from conversations with the Defendant, that the Defendant had told Ms. Charles that if Ms. Charles was unable to get methamphetamine from Ms. Bradford, the Defendant would obtain and sell methamphetamine to Ms. Charles."  Ms. Charles testified:

> Q.     Did you meet with Special Agent Chad Quarterman and Special Agent Mike Gale, and have a conversation with them about purchases from the Defendant?
>
> A.     Yes, sir.
>
> Q.     What was the nature of the conversation that you had with Agents Gale and Quarterman?
>
> A.     Just that Roger Black had – and I had spoke about getting methamphetamine.

[¶38]  We disagree that this testimony conclusively established Mr. Black's predisposition to sell methamphetamine.  The testimony does not tell us what was said between Mr. Black and Ms. Charles, what the circumstances of that conversation were, who approached whom, or who initiated the discussion of obtaining the methamphetamine.  In short, the testimony did not establish that Mr. Black volunteered his services as argued by the State.[8]

[¶39]  We do not intend to suggest that the testimony concerning Ms. Charles' initial contact with Mr. Black, or any of the other evidence cited by the State in support of

---

[7] For at least the two larger purchases of methamphetamine, Ms. Charles fronted Mr. Black the money to make the purchases, meaning she allowed him to take the money before he provided her the product.  While we agree with the State that the fronting of money to make a buy is not dispositive on the question of inducement or predisposition, *Beal* shows that it is certainly a relevant consideration.

[8] We also reject the State's assertion that the evidence cannot support a finding that DCI was targeting Mr. Black when the conversation took place.  At the time of their conversation, Ms. Charles was on the DCI payroll as a confidential informant and any efforts she made to obtain methamphetamine were undertaken in that role.  That is sufficient evidence to allow a jury to determine whether Mr. Black was targeted.

14

predisposition, was not relevant to the question. Our holding is simply that none of the evidence or testimony cited, by either the State or Mr. Black, conclusively established predisposition or a lack thereof. The evidence was in dispute, and predisposition was therefore a question for the jury.

## **CONCLUSION**

[¶40] We have recognized that an entrapment defense looms when law enforcement participates in a crime, *Jackson v. State*, 522 P.2d 1286, 1288 (Wyo. 1974), but "'[i]t is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.'" *Montez*, 527 P.2d at 1332 n.2 (quoting *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973)). Here, the facts are in dispute on the question of whether law enforcement implanted the criminal design in Mr. Black's mind, or whether it simply gave him an opportunity to act on his predisposition. The defense was therefore in play and was a question on which the jury should have been instructed.

[¶41] We reverse and remand for proceedings consistent with this opinion.