# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 28

OCTOBER TERM, A.D. 2020

February 12, 2021

MARTY MAY SMITH,

Appellant
(Defendant),

v.

S-19-0226

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Crook County*
*The Honorable Thomas W. Rumpke, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Desiree Wilson, Senior Assistant Appellate Counsel. Argument by Ms. Wilson.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General. Argument by Mr. Eames.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice**.

[¶1]   A jury convicted Marty Smith as an accessory to both involuntary manslaughter and aggravated assault and battery, and she appeals the district court's refusal to instruct the jury on her theory of defense. We conclude that the evidence was sufficient to warrant the requested instruction on defense of another and reverse.

## ISSUE

[¶2]   Ms. Smith presents a single issue on appeal, which we restate as:

> Did the district court err when it refused to instruct the jury on defense of another?

## FACTS

### I.   Events that Led to Charges

[¶3]   The events that led to the charges against Ms. Smith are presented in the light most favorable to her, in accordance with our standard of review, which requires that we view the evidence in the light most favorable to a defendant who is refused a theory of defense instruction. *Black v. State*, 2020 WY 65, ¶ 22, 464 P.3d 574, 579 (Wyo. 2020) (quoting *Garza v. State*, 2020 WY 32, ¶ 18, 458 P.3d 1239, 1243 (Wyo. 2020)).

[¶4]   On the date these events transpired, Ms. Smith worked as a bartender at the Turf Bar in Sundance, Wyoming. On most evenings that she worked, her former boyfriend Douglas Haar would spend time in the bar and would help her close. The two had been in a romantic relationship for about three years until she broke up with him in May of 2018, but they remained close friends.

[¶5]   On the evening of July 31, 2018, Ms. Smith arrived at around 5:30 p.m. for her 6:00 shift. Mr. Haar was already in the bar with a group of friends, drinking and celebrating a birthday. She served him five to six beers before he left to go to dinner with his friends, and when he returned at around 10:00 or 10:30, he told her that he drank more beer and smoked marijuana while he was gone. Before closing the bar at around 11:40, she served him five to six additional beers, followed by an eighteen-ounce double vodka and Pepsi while they cleaned the bar. She also had a vodka and Pepsi while they cleaned.

[¶6]   After closing the Turf, Ms. Smith and Mr. Haar drove around the corner to the Dime Horseshoe, another bar referred to in the record simply as "the Dime." There they met Ms. Smith's current boyfriend, Jessie Johnson, and they continued to drink. Before they left the Dime at around 1:50 a.m., Ms. Smith and Mr. Haar each had about ten to twelve drinks.

1

At some point, tension grew between Mr. Haar and Mr. Johnson, which Ms. Smith described as follows:

> Q.     Okay. So did anything – Did Jessie and Doug get along at the Dime?
>
> A.     Yeah, they got along. They seemed a little, like, irritated. I went outside and talked with Doug. Seemed to resolve it, though.
>
> Q.     What was the situation there?
>
> A.     Doug seemed like he was jealous. He was jealous of Jessie, but I told him there was no reason to be because, you know, it was – I told Doug that I loved him but wasn't in love with him; I couldn't be with him.
>
> Q.     In your opinion, do you believe that Doug was paranoid of your and Jessie's growing relationship?
>
> A.     I think so. I think he was jealous, maybe.
>
> Q.     And is that because Jessie began staying the nights at your house?
>
> A.     Yes.
>
> Q.     Did Doug ever drive by your house and see Jessie's truck there?
>
> A.     Yes.

[¶7]    When Ms. Smith was ready to leave the Dime, she told Mr. Johnson it was time to go, and the two left together.  She got into the driver's seat of her vehicle, and Mr. Johnson got into the front passenger seat.  Mr. Haar jumped uninvited into the back seat.  They then drove to the Sundance Travel Center to buy snacks.

[¶8]    The travel center had video cameras that showed the fuel pumps, the interior of the store near the front entrance, and the cash register.  The cameras recorded video, but not audio.  From the video, we know that the threesome pulled into the center's parking lot at 2:12 a.m., and Ms. Smith and Mr. Johnson entered the store about a minute later, touching hands. They then walked toward the back of the store arm in arm.

2

[¶9]    Mr. Haar entered about thirty seconds later, after gesturing angrily from just outside the front entrance.  He went into the restroom, and at 2:15 he emerged and went out the front entrance while gesturing toward the back of the store.

[¶10]   Mr. Haar stayed outside for about thirty seconds, during which he looked into the store.  He then reentered, pointed toward the back of the store, and began pacing angrily back and forth from the front toward the back, all the while appearing to yell something.

[¶11]   At about 2:16 a.m., Ms. Smith began pushing Mr. Haar toward the front entrance.  He left briefly and gestured angrily from outside.  Ms. Smith then opened the door and spoke to him, after which he gestured some more, opened the door, and then appeared to yell something toward her and Mr. Johnson.  He then drove away in Ms. Smith's vehicle with the keys she had given him, but he returned less than a minute later.[1]

[¶12]   Shortly after 2:18 a.m., Mr. Haar reentered the store once again and headed toward Ms. Smith.  They argued for about two minutes while he angrily pointed toward Mr. Johnson.  He then went to the register to pay for a couple of items, but within seconds turned back to the store and yelled again, after which he walked toward the back of the store yelling and gesturing.  At about 2:21, Ms. Smith walked with him back to the register and twice pushed him in the chest with her hand in an apparent effort to keep him at the register.  She then stumbled onto him.

[¶13]   At 2:22 a.m., Mr. Haar again left the register, walked aggressively toward Mr. Johnson, and chest-bumped him.  Ms. Smith grabbed him and pulled him away from Mr. Johnson, and he then dragged her by her shirt collar to the register.  This back and forth happened a couple more times, with Ms. Smith staying between the two men and pushing Mr. Haar back toward the register.  At 2:23, Mr. Haar left the store and then tried to reenter, but Ms. Smith shoved him out the door and went outside herself.  For the next few minutes, the two stayed outside arguing, and he continued to point and gesture toward Mr. Johnson inside the store.  Ms. Smith shoved him, slapped him, and hit him while they were outside.  At about 2:25, she fell down, and he helped her up.  He then walked toward her repeatedly, and she repeatedly pushed him away.

[¶14]   At 2:26 a.m., Ms. Smith reentered the store while trying to keep Mr. Haar out by shoving and kicking at him.  About thirty seconds later, he came in and immediately moved aggressively toward Mr. Johnson.  Ms. Smith stepped between the two men and slapped and punched Mr. Haar, and he threw her to the floor.  She got back up and continued to come between them, and Mr. Haar again threw her to the floor.  At 2:27, Mr. Haar chest-bumped Mr. Johnson again, and when Ms. Smith again tried to intervene, he threw her

---

[1] Ms. Smith testified that when she was trying to keep Mr. Haar away from Mr. Johnson, she gave him her car keys and told him to leave.  It is not clear from the video when she gave him the keys, but it does show that he left alone in the vehicle and then returned.

more violently to the floor. At that point, Mr. Johnson set down his cell phone and drink and pushed Mr. Haar away from Ms. Smith.

[¶15] While Ms. Smith remained on the floor, Mr. Haar came at Mr. Johnson and threw a punch, and Mr. Johnson returned the punch. The two men then fell to the floor, where Mr. Johnson held Mr. Haar down. At some point after they began fighting, Mr. Haar told Mr. Johnson, "I'm going to kill you, you mother fucker." At 2:29 a.m., Mr. Haar broke free and ended up on top of Ms. Smith, with Mr. Johnson on top of him. About thirty seconds later, Mr. Johnson got Mr. Haar into a chokehold, and when Mr. Haar tried to use his free arm to hit Mr. Johnson, Ms. Smith held onto it. They stayed in that position until 2:36, when Mr. Johnson released Mr. Haar from the chokehold, stood, and helped Ms. Smith up. Mr. Haar remained on the floor, and Ms. Smith and Mr. Johnson left the store, believing that Mr. Haar had passed out. Based on the video, the State's forensic pathologist later estimated that Mr. Haar lost consciousness around 2:30.

[¶16] During the fight, the store clerk called law enforcement for assistance. Officer Chris Tomford of the Sundance Police Department arrived just after Ms. Smith and Mr. Johnson left, and he found that Mr. Haar was not breathing and had no pulse. He performed CPR until an ambulance arrived and EMTs took over. The EMTs were unable to revive Mr. Haar and declared his death.

[¶17] Ms. Smith and Mr. Johnson returned to the travel center at around 3:30 or 4:00 that morning to retrieve her purse, which she had left behind after the fight. Office Tomford and another officer approached their vehicle, informed them of Mr. Haar's death, and arrested both of them.

## II.    Charges and Trial

[¶18] On August 2, 2018, the State charged Ms. Smith with four felonies: Count I, accessory before the fact of murder in the second degree; Count II, accessory before the fact of voluntary manslaughter; Count III, accessory before the fact of involuntary manslaughter; and Count IV, accessory before the fact of aggravated assault and battery. A three-day jury trial was held from February 19 through February 21, 2019.

[¶19] At trial, defense counsel offered two theories of defense and instructions to accompany them. The first was that Mr. Johnson acted in self-defense, and the second was that Ms. Smith acted in defense of Mr. Johnson. For the latter, counsel offered the following instruction:

> Marty Smith may use reasonable force to defend
> another person against an attack by an aggressor when the
> person has reasonable grounds to believe and actually does
> believe that Jesse Johnson was in imminent danger of unlawful

4

bodily harm and that the force used was necessary to prevent that harm.

[¶20]   With respect to Ms. Smith's defense of Mr. Johnson, defense counsel argued during the instructions conference that under the alter ego rule, Ms. Smith stepped into the role of Mr. Johnson and assumed his status as a non-aggressor.

> [DEFENSE COUNSEL]:  Judge, I think this is what's complicated under Wyoming case law is there's not tons of clear guidance. As the Court knows, this is kind of a very confusing video to some degree. Judge, I believe being an alterego [sic] state, if – Let's back up and say I was giving a different theory of the case. Let's say that I was proposing the theory that Ms. Smith was using self-defense and Jessie Johnson was using defense of others. If that was the defense, I think that Jessie Johnson then walks into the role of Ms. Smith. And if Ms. Smith is the aggressor, self-defense can't be used. But I'm not proposing that.
>
>      So what I'm proposing is that Ms. Smith walk into the role of Jessie Johnson. And so if Jessie Johnson's not the aggressor, then Ms. Smith can't be the aggressor because she is walking into the role of Mr. Johnson.

[¶21]   Later in the conference, defense counsel had the following exchange with the court concerning Ms. Smith's status as an aggressor.

> [DEFENSE COUNSEL]:   . . . . I would further object to any instruction regarding Ms. Smith being the aggressor. I'm still stuck on the position that it's irrelevant if Ms. Smith was the aggressor or not.
>
> THE COURT:      You may be, but the State has made a prima facie showing that she was the aggressor. They're allowed to instruct on their theory of the case as well. I understand that. I want to know what's wrong with it legally. I understand that you don't agree that that's the way things shook out, but the State has evidence of that and it's supported by evidence and it's going to be instructed. But I want to make sure I got the right instruction.

[¶22]   Following the instructions conference, the district court recessed to consider its rulings and compile the final instructions.  When it reconvened, it indicated:

5

THE COURT: . . . First of all, I want to thank counsel for their diligent work. It's a very difficult area of the law to instruct upon. I felt like I had very good submissions, good arguments and had all the facts in front of me to be able to make what may not be a correct but at least be a learned decision.

I will not instruct on defense of others. Although the burden of proof is minimal for the defense, it is only a prima facie showing. There is not even prima facie evidence to show that the altercation in which Ms. Smith was the aggressor with Mr. Haar ever ceased. Moreover, there's no evidence to support that the right to self-defense was regained under the pattern instructions, what is necessary for those items. There's just simply no evidence to support that.

However, there is evidence to support a self-defense instruction for Ms. Smith as to regards to Mr. Johnson. Mr. Johnson was acting in self-defense. There can be no accessory before the fact as criminal liability cannot attach to something that's not a crime, and I will instruct accordingly.

[¶23] The district court then instructed the jury on Mr. Johnson's right to self-defense – the instructions focused on Mr. Johnson's reasonable and honest belief under the circumstances. As to the determination of who was an aggressor, the court instructed the jury to determine only whether Mr. Johnson or Mr. Haar was an aggressor, and whether they were mutual combatants. The jury was not instructed to determine whether Ms. Smith was an aggressor.

[¶24] The jury found Ms. Smith not guilty of the first two counts against her, accessory to second degree murder and accessory to voluntary manslaughter. It found her guilty, however, of the remaining counts, accessory to involuntary manslaughter and accessory to aggravated assault and battery. The district court sentenced her to six to eighteen years in prison on the accessory to involuntary manslaughter count and six to ten years on the accessory to aggravated assault and battery count, to be served concurrently. Ms. Smith timely appealed to this Court.[2]

---

[2] Mr. Johnson was charged with second degree murder, voluntary manslaughter, involuntary manslaughter, and aggravated assault and battery, and was separately tried after Ms. Smith's trial. A jury acquitted him of all charges.

## STANDARD OF REVIEW

[¶25] "The failure to give an offered instruction on the law related to a theory of defense is a due process issue, which this Court reviews de novo." *Black*, ¶ 22, 464 P.3d at 579 (quoting *Hopkins v. State*, 2019 WY 77, ¶ 18, 445 P.3d 582, 588 (Wyo. 2019)). "An erroneous refusal of a theory of defense instruction is 'reversible error per se.'" *Black*, ¶ 22, 464 P.3d at 579 (quoting *Swartz v. State*, 971 P.2d 137, 139 (Wyo. 1998)). We have also said:

> Any competent evidence is sufficient to establish a defense theory even if it consists only of testimony of the defendant. *Best v. State*, 736 P.2d 739, 745 (Wyo. 1987). We view the evidence in a light favorable to the accused and the accused's testimony must be taken as entirely true to determine if the evidence is competent. *Duckett v. State*, 966 P.2d 941, 944 (Wyo. 1998). Even if the court deems the evidence to be weak, or unworthy of belief, the instruction must be given if a jury could reasonably conclude the evidence supports the defendant's position. *Id.*

*Black*, ¶ 22, 464 P.3d at 579-80 (quoting *Garza*, ¶ 18, 458 P.3d at 1243).

## DISCUSSION

[¶26] At common law, defense of another incorporated the "alter ego rule," which provides that "[o]ne asserting the justification of defense of another steps into the position of the person defended." *Starr v. State*, 2017 WY 61, ¶ 11, 395 P.3d 180, 183 (Wyo. 2017) (quoting *Leeper v. State*, 589 P.2d 379, 383 (Wyo. 1979)). Based on this rule, Ms. Smith contends, as she did below, that whether she was an aggressor in the conflict with Mr. Haar was irrelevant because she stepped into Mr. Johnson's position when she acted to defend him. Alternatively, she argues that the evidence at trial created a disputed issue of fact as to whether she was an aggressor in the dispute with Mr. Haar or was acting in defense of Mr. Johnson throughout the conflict.

[¶27] The State does not respond to either of these arguments. It instead contends that the district court did not abuse its discretion in refusing Ms. Smith's defense of another instruction because under the alter ego rule, the instruction would have been cumulative and confusing. It argues (footnote omitted):

> In Wyoming, a defender steps into the place of the person being defended and can assert that person's right to self-defense. Because the district court instructed the jury on Johnson's right to self-defense and on the fact that Smith could not be

7

convicted as an accessory if it found Johnson acted in self-defense, the court did not err when it rejected Smith's cumulative and confusing defense of another instruction.

[¶28]   In recent cases we have updated our law of self-defense and addressed confusion that has emerged in its application.  *See State v. John*, 2020 WY 46, 460 P.3d 1122 (Wyo. 2020) (addressing 2018 amendments to self-defense statute that created immunity from prosecution for certain defensive acts); *Widdison v. State*, 2018 WY 18, 410 P.3d 1205 (Wyo. 2018) (addressing parameters of the castle doctrine); *Drennen v. State*, 2013 WY 118, 311 P.3d 116 (Wyo. 2013) (reviewing history of self-defense in Wyoming and correcting instructions).  This case presents the first recent opportunity to do the same with respect to defense of another, so we will begin there and address the parties' arguments as we proceed.

## I.    Defense of Others and the Alter Ego Rule

[¶29]   Self-defense and defense of another were purely common law defenses until 2008, when the legislature enacted statutes to address them.  *See* 2008 Wyo. Sess. Laws, ch. 109. Those statutes were most recently amended in 2018, and effective July 1, 2018, the relevant provision states:

> (a) The use of defensive force whether actual or threatened, is reasonable when it is the defensive force that a reasonable person in like circumstances would judge necessary to prevent an injury or loss, and no more, including deadly force if necessary to prevent imminent death or serious bodily injury to the person employing the deadly force or to another person. As used in this subsection, "necessary to prevent" includes a necessity that arises from an honest belief that the danger exists whether the danger is real or apparent.

Wyo. Stat. Ann. § 6-2-602 (LexisNexis 2019).[3]

[¶30]   Since its inception, the self-defense statute has left room for the continued application of common law principles.  *See* Wyo. Stat. Ann. § 6-2-601 ("The common law shall govern in all cases not governed by this article.").  We have recognized, however, that "[w]hen the legislature amended § 6-2-602 in 2018, it exercised its exclusive power to determine and declare what acts constitute a crime when the underlying facts implicate self-defense principles."  *John*, ¶ 26, 460 P.3d at 1131.  Thus, the statute governs our analysis, and only those "[c]ommon law principles consistent with the statutory language

---

[3] Before the 2018 amendments to the self-defense statute, subsection (a), as it now reads, did not exist.  *See John*, ¶ 4, 460 P.3d at 1126.

8

may guide our application of the statutory requirements, definitions, and presumptions." *Id.* ¶ 43, 460 P.3d at 1135.

[¶31]   At common law, we defined defense of another to include the alter ego rule.

> ***One asserting the justification of defense of another steps into the position of the person defended.*** Defense of another takes its form and content from defense of self. The defender is not justified in using force unless he or she reasonably believes the person defended is in immediate danger of unlawful bodily harm, and that the force is reasonable and necessary to prevent that threat.

*Starr*, ¶ 11, 395 P.3d at 183 (quoting *Leeper*, 589 P.2d at 383) (emphasis added).

[¶32]   The rule has been explained as follows:

> The rule held that a person coming to the aid of another "stepped into the shoes" of the person defended, in effect becoming their alter ego. The alter ego rule was based on the premise that one can not [sic] justify the use of deadly force in self-defense if he is at fault. Therefore, if the defended person was at fault in any way, a legal fiction "imputed" knowledge of that fault to the intervenor. If the defended person, by his own actions, lost the right of self-defense, then consequently, the intervenor's right to argue justifiable homicide was also negated.

Marco F. Bendinelli & James T. Edsall, *Defense of Others: Origins, Requirements, Limitations and Ramifications*, 5 Regent U. L. Rev. 153, 157 (1995) (footnotes omitted).

[¶33]   Under the alter ego rule, "anyone venturing to render assistance in the defense of a third person [would do] so at his own peril." Bendinelli, *supra*, at 158 (internal quotation marks omitted); *see also Leeper*, 589 P.2d at 383 ("As the rights of the defender are coterminous with the right of the defense of self, and as one who initiated a battle had no right to self-defense absent abandonment, withdrawal or retreat available or communicated, one who defends an aggressor does so at his or her peril."). Because of its imputation of knowledge to the defender, the rule has been criticized as "repugnant to the fundamental principle of Anglo-American criminal jurisprudence . . . that the defendant must be shown to have a mens rea, or guilty intent." Bendinelli, *supra*, at 160. Others have criticized it because it discourages an onlooker from coming to the aid of one being violently assaulted for fear of "legal peril." *Id*. at 159; *see also Alexander v. State*, 447 A.2d 880, 881 (Md. Ct. Spec. App. 1982). Consequently, nearly all jurisdictions have

abandoned the rule in favor of standards that "allow exculpation based upon the intervenor's reasonable belief that his defensive action was required." Bendinelli, *supra*, at 159-60.

[¶34]  We now join those jurisdictions that have abandoned the alter ego rule. While we agree with the stated policy considerations against it, we more importantly conclude that the rule is incompatible with the Wyoming Criminal Code. First, it conflicts with the code's abolition of all common law crimes. *See* Wyo. Stat. Ann. § 6-1-102(a) ("Common-law crimes are abolished. No conduct constitutes a crime unless it is described as a crime in this act or in another statute of this state."). None of our code's crimes against persons purports to criminalize conduct based on imputed knowledge, but the alter ego rule is a common law rule that effectively does just that. *See generally* Wyo. Stat. Ann. § 6-2-101, *et seq.*; *State v. Cook*, 515 S.E.2d 127, 135 (W. Va. 1999) ("The alter ego rule worked a considerable hardship upon defendants who unknowingly intervened to aid third parties who were not privileged to use self-defense. In such situations, the intervenor was criminally liable for any injury or death he or she caused."). More specifically, however, the rule runs counter to our self-defense statute. *See* Wyo. Stat. Ann. § 6-2-602(a).

[¶35]  Section 602(a) looks to what a reasonable person in like circumstances would judge necessary to prevent injury or loss, and to "an ***honest belief*** that the danger exists whether the danger is real or apparent." Wyo. Stat. Ann. § 6-2-602(a). This language requires consideration of what the defender reasonably and honestly believed, which is a focus entirely inconsistent with imputed knowledge.

> The majority of the states have abandoned the alter ego rule by statute, adopting a standard which examines the reasonableness of an intervenor's belief that his action was necessary and prompted by an imminent threat of danger. Under this standard, the intervenor who makes a mistake as to one of the other requirements of the defense may still be exculpated, provided that he had a reasonable belief that those conditions existed. The reasonableness of the actor's belief is the critical factor. If the intervenor is unreasonable in forming his belief, irrespective of whether the other conditions are met, he will be without a justification defense.

Bendinelli, *supra*, at 174; *see also Grant v. State*, 266 So.3d 203, 207 (Fla. Dist. Ct. App. 2019) ("Florida, . . . like nearly all American jurisdictions, abandoned the common law alter ego rule long ago by adopting a 'reasonable belief' standard."); *State v. Mayo*, 113 A.3d 250, 259 (N.H. 2015) ("[The statute's] reasonableness language is fundamentally different from the alter-ego rule, which is not based upon the actor's subjective perception and objectively reasonable perception of the circumstances, but instead is based upon whether the actor was factually correct in his assessment of the circumstances."); *Cook*,

515 S.E.2d at 137 ("The 'reasonable belief' standard of intervention emphasizes what the intervenor believes about the circumstances, as opposed to what are the actual circumstances."); *Morris v. State*, 405 So.2d 81, 83 (Ala. Crim. App. 1981) ("The test 'reasonably believes' shifts the emphasis to defendant's reliance on reasonable appearances rather than exposing him to the peril of defending another where appearances were deceiving and there was no actual imminent danger.").

[¶36]  This is not to say that we are altogether abandoning our common law guidance on defense of another.  Once the alter ego rule is stripped from the common law definition, nothing else in that definition conflicts with section 602(a).  We thus adhere to the following as relevant to determining when defense of another is appropriately asserted:

> Defense of another takes its form and content from defense of self. The defender is not justified in using force unless he or she reasonably believes the person defended is in immediate danger of unlawful bodily harm, and that the force is reasonable and necessary to prevent that threat.

*Starr*, ¶ 11, 395 P.3d at 183 (quoting *Leeper*, 589 P.2d at 383).

[¶37]  This means that if the person on whose behalf the defender intervenes was an initial aggressor or otherwise ineligible to assert a claim of self-defense, the defender may likewise be precluded from asserting defense of another.  Whether that is the case, however, depends on the reasonable and honest belief of the defender, which is based on the defender's perception as opposed to actual circumstances unknown to the defender.  Another court explained:

> If an actor knew or should have known that the third person was the initial aggressor or provoker, then the jury may determine that the actor's use of force against the victim in defense of the third person was not justified because, under those circumstances, the victim's use of force against the third person may not have been *unlawful*. In that situation, the victim may have been *lawfully* using force to defend himself from the third person. However, if the actor neither believed nor reasonably should have believed that the third person was the initial aggressor or provoker, then—assuming all other conditions of the defense also are met—the jury may determine that his use of force against the victim in defense of the third person was reasonable, and thus justifiable, even if the third person actually was the initial aggressor or provoker.

*Mayo*, 113 A.3d at 260.

11

[¶38]  The record in this case illustrates how the focus on a defender's reasonable and honest belief could play out under these circumstances.  The jury rejected Ms. Smith's claim that Mr. Johnson was himself acting in self-defense, but we do not know why.  It may have found that he was an initial aggressor or that he and Mr. Haar were mutual combatants.  If that were the case, the question as to Ms. Smith would be whether she knew or should have known.

[¶39]  Alternatively, the jury may have concluded that Mr. Johnson was neither an initial aggressor nor a mutual combatant, but that he used unjustified force in restraining Mr. Haar.  In that regard, the State presented the testimony of Steve Colling, Mr. Johnson's high school wrestling coach.  Mr. Colling testified that he did not coach his wrestlers to use a chokehold because it would result in a penalty and was "dangerous and could hurt somebody."  While a jury finding that Mr. Johnson used an unreasonable level of force would preclude his assertion of self-defense, that finding would not necessarily preclude Ms. Smith from asserting that she was engaged in defense of another.  The question would again be whether Ms. Smith knew or should have known that she was aiding Mr. Johnson in the use of unreasonable force.

[¶40]  Our current self-defense statute mandates this shift in focus.  While the right to self-defense of the person defended remains relevant, it is no longer the law in this state that a defender's right to act depends solely on the rights of the person defended.  For this reason, we reject the State's argument that the district court's decision may be upheld based on application of the alter ego rule.

[¶41]  Having concluded that the alter ego rule no longer applies in this state, we turn to whether the initial aggressor rule applies to one asserting defense of another.

## II.    Initial Aggressor Rule

[¶42]  This Court has long adhered to the common law rule that an initial aggressor, one who provokes a conflict, must withdraw from that conflict before he or she will be entitled to assert a claim of self-defense.  *See Drennen*, ¶ 24, 311 P.3d at 125-26; *State v. Flory*, 40 Wyo. 184, 276 P. 458, 462 (1929).  The rule is stated as follows:

> Generally, the right to use self-defense is not available to an aggressor who provokes the conflict. However, if one provokes a conflict but thereafter withdraws in good faith and informs the adversary by words or actions of the desire to end the conflict and is thereafter pursued, that person then has the same right of self-defense as any other person. The person is justified in using force to the same extent that any other person would be who was acting in self-defense.

12

*Farrow v. State*, 2019 WY 30, ¶ 31, 437 P.3d 809, 819 (Wyo. 2019) (quoting with approval Wyo. Crim. Pattern Jury Instr. 8.03A).

[¶43] As discussed above, although defense of another is not purely dependent on the self-defense rights of the one defended, it nonetheless "takes its form and content from defense of self." *Starr*, ¶ 11, 395 P.3d at 183 (quoting *Leeper*, 589 P.2d at 383). That being the case, the rules applicable to self-defense are likewise applicable to defense of another. *Smith v. State*, 773 P.2d 139, 142 (Wyo. 1989) ("In the alternate situation wherein there are an assailant, a defendant, and a defender—i.e., defense of another—the standards are not changed."). This means that the initial aggressor rule continues to apply unless the rule conflicts with our self-defense statute. *John*, ¶ 43, 460 P.3d at 1135 ("Common law principles consistent with the statutory language may guide our application of the statutory requirements, definitions, and presumptions . . . .").

[¶44] We find nothing in the self-defense statute that would preclude application of the initial aggressor rule to one asserting defense of another. The statute sets identical requirements for self-defense and defense of another, and it expressly recognizes the initial aggressor rule in addressing the duty to retreat. *See* Wyo. Stat. Ann. § 6-2-602(e) ("A person who is attacked in any place where the person is lawfully present shall not have a duty to retreat before using reasonable defensive force pursuant to subsection (a) of this section provided that he is not the initial aggressor and is not engaged in illegal activity."). Moreover, we have continued to recognize the initial aggressor rule in the wake of the 2018 amendments to the statute. *See John*, ¶ 54, 460 P.3d at 1137; *Farrow*, ¶ 31, 437 P.3d at 819. For these reasons, the initial aggressor rule applies when defense of another is asserted.

[¶45] We note also that even if the alter ego rule were to remain the law in this state, we would reject Ms. Smith's argument that whether she was or was not an initial aggressor was irrelevant. Her suggestion is that because Mr. Johnson was not an aggressor, she, as his defender, stepped into his shoes and took on his role as a non-aggressor. This has never, however, been how the alter ego rule operated. The rule restricted defense of another. It did not broaden the defense by allowing a person to create a conflict and then avoid culpability for that instigation by acting in defense of another. Our law is clear that whether asserting defense of self or of another, one is not justified in using force to defend against a conflict of her own making unless she first withdraws from the conflict.

[¶46] With these considerations in mind, we turn to our review of the district court's refusal of Ms. Smith's theory of defense instruction.

## III.    District Court's Refusal of Defense of Another Instruction

[¶47]    The district court found that Ms. Smith was the aggressor in her conflict with Mr. Haar and that she never withdrew from being the aggressor.  Because an aggressor may not assert defense of another without first withdrawing from the conflict, the court concluded that Ms. Smith had not made a prima facie showing to support her theory of defense instruction. The question Ms. Smith raises on appeal is whether the evidence conclusively established that she was an aggressor or whether the question was one for the jury.

[¶48]    Before reviewing the evidence on this question, we will first address Ms. Smith's failure to argue it below in support of her theory of defense instruction.  We will then turn to our review of the evidence in support of Ms. Smith's defense of another instruction, beginning with the evidence bearing on whether she was an initial aggressor, and concluding with the evidence bearing more specifically on her claim that she had to act in defense of Mr. Johnson.  Finally, we will address the State's argument that a defense of another instruction would have confused the jury.

## A.    Ms. Smith's New Argument on Appeal

[¶49]    We normally do not consider arguments made for the first time on appeal.

> This Court "strongly adheres" to the rule "that it will not address issues that were not properly raised before the district court." *Courtenay C. & Lucy Patten Davis Found. v. Colorado State Univ. Research Found.*, 2014 WY 32, ¶ 36, 320 P.3d 1115, 1126 (Wyo. 2014) (citation omitted); *Davis v. City of Cheyenne*, 2004 WY 43, ¶ 26, 88 P.3d 481, 490 (Wyo. 2004). "We recognize only two exceptions to that rule: when the issue raises jurisdictional questions or it is of such a fundamental nature that it must be considered." *Davis*, ¶ 26, 88 P.3d at 490. "[I]t is unfair to reverse a ruling of a trial court for reasons that were not presented to it, whether it be legal theories or issues never formally raised in the pleadings nor argued to the trial court." *Basic Energy Servs., L.P. v. Petroleum Res. Mgmt., Corp.*, 2015 WY 22, ¶ 28, 343 P.3d 783, 791 (Wyo. 2015) (citations omitted).

*Four B Prop., LLC v. Nature Conservancy*, 2020 WY 24, ¶ 69, 458 P.3d 832, 849 (Wyo. 2020).

[¶50]    Defense counsel clearly offered defense of another as a theory of Ms. Smith's defense, and he argued to the district court that Ms. Smith should not be treated as an

aggressor for purposes of that defense. What defense counsel did not argue, but now argues on appeal, is that the jury should have been instructed to determine whether Ms. Smith was an aggressor, or whether she was instead acting in defense of Mr. Johnson throughout the entirety of her physical altercation with Mr. Haar. Ms. Smith's argument is thus new on appeal.

[¶51] We nonetheless conclude that it is appropriate to consider Ms. Smith's reframed argument. First, since the right to a theory of defense instruction is "so important" that the erroneous refusal of one is reversible error per se, we consider the argument to be of a fundamental nature. *Black*, ¶ 22, 464 P.3d at 579 (quoting *United States v. Ortiz*, 804 F.2d 1161, 1163-64 (10th Cir. 1986)). Additionally, the record is fully developed as to whether Ms. Smith was an aggressor or a defender, so the question is otherwise properly before us. *See Davis v. State*, 2018 WY 40, ¶ 34, 415 P.3d 666, 678 (Wyo. 2018) (noting the Court will not consider a new issue on appeal where it is not properly developed for review). Finally, the alter ego rule, which we now hold is no longer the law in this state, undoubtedly contributed to the confusion in defense counsel's arguments.

## B.     Ms. Smith's Status as Initial Aggressor

[¶52] In defining the term "initial aggressor," we have said that "[s]ome sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor. Verbal provocation without more is generally insufficient[.]" *Widdison*, ¶¶ 35-36, 410 P.3d at 1216-17. Additionally, it is not always the case that the first person in a conflict to use physical force is necessarily the initial aggressor. As one court explained:

> [A] person may respond with physical force to a reasonably perceived threat of physical force without becoming the initial aggressor and forfeiting the defense of self-defense. Otherwise, in order to avoid being labeled the aggressor, a person would have to stand by meekly and wait until an assailant struck the first blow before responding.

*State v. Jones*, 128 A.3d 431, 452 (Conn. 2015) (quoting *State v. Jiminez*, 636 A.2d 782, 785-86 (Conn. 1994)); *see also State v. Espinosa*, 438 P.3d 582, 587 (Wash. Ct. App. 2019) (holding that whether firing of shot into air was first aggressor act or defense of others was a jury question); *People v. Silva*, 987 P.2d 909, 916 (Colo. Ct. App. 1999) ("person may respond with physical force to reasonably perceived threat of physical force without being the initial aggressor") (citation omitted).

[¶53] In keeping with our focus on the defender's reasonable and honest perception of an event, it is also important to consider an actor's intent and reasonable expectations. *See Cavaness v. State*, 358 P.2d 355, 357-58 (Wyo. 1961) ("[A] personal affront of such serious

character as to be reasonably calculated to provoke a dangerous assault from another is generally deemed sufficient to authorize a jury to deny the ordinary right of self-defense."); *State v. Bristol*, 53 Wyo. 304, 84 P.2d 757, 763 (1938) ("The accused must willingly and knowingly have used some language or have done some act after meeting his antagonist, reasonably calculated to lead to an affray or deadly conflict[.]"). Another court has explained:

> However, "[n]ot every act of a defendant will make him or her an aggressor. It is the character of the act coupled with the intent of the defendant that determines whether the defendant is the aggressor." *State v. McGee*, 51,977, p. 12 (La.App. 2 Cir. 4/3/19), writ denied, 19-761 (La. 11/19/19), 282 So.3d 1066 (citing *State v. Spivey*, 38,243 (La. App. 2 Cir. 5/12/04), 874 So.2d 352). Further, "[t]he act of aggression which would thereafter preclude asserting the right of self-defense must be such that the response elicited from the victim by the aggressive act can be termed a reasonable response to that act." *State v. Gonday*, 442 So.2d 703, 706 (La.App. 1 Cir. 1983). For example, "[i]f a defendant curses a victim and the victim pulls a gun to kill the defendant certainly the defendant is not precluded by the original aggressive act of cursing from killing the victim in order to save his own life" and thus "[u]nder these circumstances the victim's response to the aggressive act would be unreasonable." *Id*.

*State v. Brister*, 297 So.3d 992, 1007 (La. Ct. App. 2020); *see also Taylor v. State*, 287 So.3d 202, 206 (Miss. 2020) ("The unlawful act must be one that is calculated and intended to provoke a difficulty or encounter wherein the accused is afforded the opportunity to and does slay his adversary[.]") (quoting *Patrick v. State*, 285 So. 2d 165, 169 (Miss. 1973)); *Klumb v. State*, 712 P.2d 909, 911 (Alaska Ct. App. 1986) (crucial inquiry in determining aggressor status is whether assault occurred "in the course of a dispute provoked by the defendant at a time when he [knew] or ought reasonably to [have known] that the encounter [would] result in mortal combat.") (quoting *Brown v. State*, 698 P.2d 671, 674 (Alaska Ct. App. 1985)).

[¶54] Thus, in determining whether Ms. Smith was the initial aggressor in this conflict, we must consider the character of her aggression, her intent, and whether she knew or should have known that her use of physical force would produce the altercation that eventually ensued. Bearing these considerations in mind, and viewing the evidence in the light most favorable to Ms. Smith, we conclude that this question should have been submitted to the jury.

[¶55] First, there is the video. When viewed in the light most favorable to Ms. Smith, it shows that from the outset of the threesome's arrival at the store, Mr. Haar behaved in an angry and physically aggressive manner. He gestured and pointed angrily, and he yelled and strode aggressively toward Ms. Smith and Mr. Johnson. The video of Ms. Smith, when likewise viewed in the proper light, shows that each time she used physical force, she was either pushing Mr. Haar toward the exit and away from Mr. Johnson, or intervening between Mr. Haar and Mr. Johnson, as Mr. Haar came at Mr. Johnson.

[¶56] Ms. Smith's testimony supports this view of the video. She testified that when they were in the store, Mr. Haar was angry with her for being with Mr. Johnson, and that she knew from past experience that when Mr. Haar was that angry, he could become physically violent. She further testified that he yelled at Mr. Johnson and called her a bitch and a whore. She then testified:

> Q.      Okay. So after he called you a bitch or a whore, did you – did you try to – what is the next thing that happened?
>
> A.      I can't – I was trying to get him to leave because I – he was really angry, and I was trying to get him to leave. I kept telling him to go. I'd push him out of the store. And I thought he was going to hurt me or fight Jessie, and I didn't want no fights, and I just tried to stop them.
>
> Q.      Matter of fact, did you tell him to take your car and leave?
>
> A.      Yes.
>
> Q.      And did he take your car and leave?
>
> A.      Yes.
>
> Q.      But then –
>
> A.      He came back.

[¶57] Howard Elvers, the convenience store clerk, also testified, and his recorded statement to law enforcement was admitted. He reported to law enforcement that Mr. Haar yelled at Mr. Johnson, dropped "F-bombs," and called Mr. Johnson a fucking punk. He also reported that the conflict was primarily between Mr. Haar and Mr. Johnson, but Ms. Smith "butted in."

17

[¶58] This evidence created a disputed issue of fact concerning Ms. Smith's intent and whether her use of physical force was the act of an aggressor or the act of a defender. Additionally, a factual dispute exists as to whether she knew or should have known that her use of physical force would result in the altercation that ultimately occurred.

[¶59] Ms. Smith testified that she recalled Mr. Haar laughing at her as she was hitting him at the travel center, and that in the past when they fought, he always laughed when she hit him. The video confirms this. At times Mr. Haar laughed at her and at other times he appears to goad or taunt her into hitting him. A reasonable inference from this evidence is that Ms. Smith had no reason to believe that her physical interference would cause a further altercation. Indeed, throughout the video, Mr. Haar does not appear particularly bothered by Ms. Smith's use of physical force and even helped her up when she fell to the ground.

[¶60] It was not until just before the ultimate altercation, when Mr. Haar began chest-bumping Mr. Johnson, that he reacted violently to her physical force. Each time he chest-bumped Mr. Johnson, Ms. Smith intervened, and each time she intervened, he dragged her away or threw her to the floor. An inference could reasonably be drawn that Ms. Smith's behavior prompted him to throw her to the ground, not in an effort to defend against her, but because she was interfering with his attack on Mr. Johnson.

[¶61] A future jury might very well view the evidence differently, but given the inferences to which Ms. Smith was entitled, the evidence was sufficient to require that the question of whether she was an initial aggressor should have been submitted to a jury. *See Widdison*, ¶ 36, 410 P.3d at 1217 ("In cases where the determination of which party was the aggressor is in dispute, the jury should be specifically instructed as to the definition of 'aggressor' so it can resolve the factual issue.") (quoting *Drennen*, ¶ 32, 311 P.3d at 127).

C.    **Defense of Another Evidence**

[¶62] A person acting in defense of another "is not justified in using force unless he or she reasonably believes the person defended is in immediate danger of unlawful bodily harm, and that the force is reasonable and necessary to prevent that threat." *Starr*, ¶ 11, 395 P.3d at 183 (quoting *Leeper*, 589 P.2d at 383); *see also* Wyo. Stat. Ann. § 6-2-602(a). In addition to the evidence discussed above, there was evidence that:

- when Mr. Haar and Mr. Johnson started fighting, Mr. Haar said "I'm going to kill you, you mother fucker;"

- during the fight, Mr. Johnson asked the store clerk for help and twice asked him to call law enforcement;

- during the fight, Ms. Smith was trapped under the two men;

18

- during the fight, Mr. Haar continued to yell, "You mother fucker. I'm going to kill you. I'm going to kick your ass;" and "I'm going to fucking get you whenever you let go. I'm going to fucking kill – get you when you let go, when I get up;" and

- during the fight, Mr. Haar kept trying to hit Mr. Johnson, and Ms. Smith held his arm to keep him from hitting Mr. Johnson and to try to calm him.

[¶63] Accepting this evidence as true, as we must, we can only conclude that it was sufficient to support Ms. Smith's reasonable belief that she had to act to defend Mr. Johnson.

### D.   Jury Confusion

[¶64] Concerning theory of defense instructions, we have said:

> A proper theory of defense instruction must "sufficiently inform the jury of the theory of defense," and there must be "competent evidence" to support that theory of defense. *Bruce v. State*, 2015 WY 46, ¶ 79, 346 P.3d 909, 932 (Wyo. 2015) (citation omitted). . . . A court may properly reject a proposed theory of defense instruction if it is "erroneous, confusing, argumentative, or if the instruction unduly emphasizes one aspect of the case, the law, or the defendant's version of the events." *Id*. at ¶ 79, 346 P.3d at 932. All of these questions assume that the theory at issue is, in fact, a recognized theory of defense. *See Bouwkamp* [*v. State*], 833 P.2d [486,] 490 [(Wyo. 1992)].

*Harnetty v. State*, 2019 WY 21, ¶ 29, 435 P.3d 368, 374 (Wyo. 2019).

[¶65] There is no question that defense of another is a recognized defense in this jurisdiction, and that Ms. Smith's proffered instruction correctly stated the law. Additionally, as discussed above, the defense is supported by competent evidence. The instruction should therefore have been given unless it was argumentative, would create confusion, or unduly emphasized the defendant's version of the events.

[¶66] Of these remaining grounds for refusing Ms. Smith's proffered instruction, the State contends only that a defense of another instruction would have confused the jury. It argues that because the force that took Mr. Haar's life was the force inflicted by Mr. Johnson, and as an accomplice, Ms. Smith's liability is derivative of Mr. Johnson's guilt, the only force that the jury should consider is Mr. Johnson's. We reject this argument because it ignores

the elements of the crime of accessory before the fact, as well as Ms. Smith's defenses to the crime.

[¶67] "A person who knowingly aids or abets in the commission of a felony, or who counsels, encourages, hires, commands or procures a felony to be committed, is an accessory before the fact." Wyo. Stat. Ann. § 6-1-201(a). Ms. Smith had two defenses to the charges against her. Her first defense was that no felony was committed because Mr. Johnson acted in self-defense. Her second was that she did not knowingly aid or abet in a felony because she acted not to assist Mr. Johnson in his chokehold but because she reasonably believed the force that she used was necessary to defend him. In other words, even if the jury were to find Mr. Johnson guilty of the underlying felony, it could still acquit Ms. Smith if it found that she did not knowingly aid or abet in the commission of that felony. Her perceptions and the level of force she used were thus directly in issue, and we believe that upon proper instruction, the jury would understand the distinction.

[¶68] We reverse and remand for proceedings consistent with this opinion.