# THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 152

OCTOBER TERM, A.D. 2022

December 1, 2022

JOHN GERALD HOWITT,

Appellant
(Defendant),

v.

S-21-0284

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Albany County*
*The Honorable Tori R.A. Kricken, Judge*

*Representing Appellant:*
>   Office of Public Defender: Diane M. Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
>   Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames*, Senior Assistant Attorney General; Timothy P. Zintak*, Senior Assistant Attorney General. Argument by Mr. Zintak.

* An Order Allowing Withdrawal of Counsel was entered on August 1, 2022.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

*FENN, J., delivers the opinion of the Court; KAUTZ, J., files a dissenting opinion in which FOX, C.J., joins.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]     A jury convicted John Howitt of aggravated assault and battery after he shot a man at a campground.  Mr. Howitt argues the trial court erred when it refused to give his proposed castle doctrine instructions.  We reverse and remand.

## ISSUE

[¶2]     We rephrase the issue as follows:

> I.      Did the district court commit legal error when it removed from the jury's consideration the factual question of whether Mr. Pickering was "in the process" of unlawfully and forcefully entering Mr. Howitt's "home" or "habitation"?

## FACTS

[¶3]     On July 24, 2020, John Howitt was camping at the Willow Creek Campground near Centennial, Wyoming, where he had arrived approximately five days earlier.  There were several containers of camping gear in and around his vehicle, and Mr. Howitt set up his campsite so he could sleep in his vehicle by clearing space on the passenger side and folding down the rear seat.

[¶4]     That same day, Drew Pickering, a resident of Boulder, Colorado, decided to go camping around Centennial, Wyoming.  Mr. Pickering left Boulder around 5:00 p.m.  He arrived at the Willow Creek Campground between 7:30 p.m. and 7:45 p.m.  He drove through the campground to see if there were any available campsites.  He then drove to the nearby Brooklyn Lake Campground to see which campsites were available there but returned to Willow Creek when he discovered the Brooklyn Lake Campground was more crowded.  Mr. Pickering arrived back at the Willow Creek Campground around 8:30 p.m.  He parked his vehicle near the entrance of the campground and took his dog for a walk before making his final decision on where to camp.

[¶5]     Mr. Pickering sent numerous text messages as he walked around the campground.  Some of these messages indicated Mr. Pickering was lost, stumbling, and did not know where he had left his vehicle.  The last message Mr. Pickering sent was at 9:44 p.m.  After sending this message, Mr. Pickering heard a sound and looked around to figure out what it was.  He felt something punch his left hip.  He then heard a man say: "Yep, you've been shot," and "I thought I told you not to come back here again."  After realizing he had been shot, Mr. Pickering sat down on the ground.

1

[¶6]    Cameron Knutson, Adam Geoffroy, and Treyton Johnson were also staying at the Willow Creek Campground on July 24, 2020. They had been hiking in the woods behind their campsite just after dark when they heard a gunshot. About ten minutes later, they decided to return to their campsite. Shortly after they returned, they heard someone saying "hello" repeatedly from the campsite next to theirs. Mr. Howitt approached them and asked if they had been able to get through to 911. They asked Mr. Howitt if this had anything to do with the gunshot, and he informed them he had just shot someone.

[¶7]    Mr. Knutson grabbed his medical kit, and the three men went to Mr. Howitt's campsite. They saw Mr. Pickering lying on the ground. The men estimated Mr. Pickering was between five and fifteen feet away from Mr. Howitt's vehicle when they first arrived on the scene.

[¶8]    As the three men rendered aid to Mr. Pickering, Mr. Howitt became increasingly angry with Mr. Pickering and started making comments like: "I'll bet you'll never drink again f**ker," "You deserved what you got," "You're lucky I'm a good shot," "I could've killed you," and "I told you not to mess around with me." Mr. Howitt tried to convince the three men that Mr. Pickering had been threatening him and was under the influence of drugs or alcohol. Mr. Pickering seemed to be confused, and he kept asking the three men what had happened, who they were, and where his dog was. Mr. Pickering kept asking Mr. Howitt questions like: "Why are you so mad at me?" and "Why are you so angry?" Mr. Howitt told the three men that Mr. Pickering was "messing with him" throughout the evening. He told them Mr. Pickering had been knocking on the window of his vehicle telling him that he was going to "beat the sh*t out of him." Mr. Howitt also said he had threatened to shoot Mr. Pickering, and then he did.

[¶9]    While the three men were rendering first aid, Mr. Howitt started taking videos of Mr. Pickering with his phone; he later told law enforcement he took these videos hoping to catch Mr. Pickering saying something incriminating. In these videos, Mr. Howitt repeatedly asked Mr. Pickering how much alcohol he had consumed and whether he was under the influence of any illicit drugs. Mr. Howitt did not ask Mr. Pickering any questions about the incident itself. When Mr. Pickering started to tell his version of events to Mr. Geoffroy, Mr. Howitt ended the recording. After multiple unsuccessful attempts to call 911, Mr. Geoffroy stayed with Mr. Pickering to render first aid while Mr. Knutson and Mr. Johnson drove into Centennial to call 911.

[¶10]  Trooper Ethan Smith was the first law enforcement officer to arrive at the Willow Creek Campground. When he arrived on the scene, Trooper Smith saw Mr. Pickering lying on the ground, with one individual crouching about halfway down his body, and another individual standing up by his head. He estimated Mr. Pickering was about ten-to-fifteen feet away from the vehicle that was parked in the campsite. As he approached, he asked who had shot Mr. Pickering. Mr. Howitt admitted he shot Mr. Pickering. Mr. Howitt continued to ask Mr. Pickering how much alcohol he had consumed and if he had taken

any illicit drugs. Trooper Smith placed Mr. Howitt in handcuffs, and he then assisted Mr. Geoffroy in rendering aid to Mr. Pickering.

[¶11] Emergency Medical Services (EMS) arrived on the scene shortly after Trooper Smith had placed Mr. Howitt in handcuffs. Mr. Pickering sustained a gunshot wound to his left hip. He was taken by ambulance to the Centennial Volunteer Fire Department, and he was then airlifted to the Medical Center of the Rockies in Loveland, Colorado. Mr. Pickering's blood was drawn at the hospital, and it showed he had a blood alcohol content (BAC) of .2%. Mr. Pickering also tested positive for marijuana.

[¶12] Mr. Howitt gave multiple statements to law enforcement, both at the scene and at the Albany County Sheriff's Office. Mr. Howitt stated he saw a man walking his dog around the campground earlier that night.[1] The man was stumbling and staggering and appeared to be intoxicated. He did not get a good look at this individual because it was getting dark, and the individual was at a distance. However, he could tell the person was wearing a blue shirt. He saw this person circle the campground many times. Mr. Howitt did not think this guy "had a clue what was going on," and he was "concerned" about his intentions at that time.

[¶13] Mr. Howitt said he went to bed in his vehicle shortly after dark, wearing only his underwear and socks. The doors to his vehicle were locked and the windows were rolled up. His head was positioned behind the front passenger seat, and his feet were facing the rear of the vehicle. About ten-to-fifteen minutes later, he saw a light bobbing up and down. He felt someone repeatedly bump against or rock the front of his vehicle. Mr. Howitt yelled at the person and asked him what he was doing. Mr. Howitt then heard footsteps in the gravel, which indicated the person had moved away to the right of the vehicle. Mr. Howitt stated he warned the individual numerous times not to come near him. The person yelled something to the effect of: "I'll come over there and slap the f**king sh*t out of you." The person then aggressively lunged at or advanced toward Mr. Howitt's vehicle. Mr. Howitt could hear the person pick up speed as he approached. Mr. Howitt estimated Mr. Pickering was within feet of his vehicle. Mr. Howitt could not tell if Mr. Pickering was brandishing a weapon because it was pitch black.

[¶14] Mr. Howitt indicated he feared for his life, so he retrieved his gun, opened the rear passenger door, raised the gun above the doorframe, and shot downwards toward the man's legs. Mr. Howitt stated he did not intend to kill Mr. Pickering. After shooting Mr. Pickering, Mr. Howitt attempted to call 911 multiple times, but he was unable to get through. Mr. Howitt made his first attempted call to 911 at 9:48 p.m., and he made a final attempt at 10:06 p.m.

---

[1] In one of his statements, he claimed the man had been walking around the campground "all night."

[¶15]  The deputies asked Mr. Howitt if Mr. Pickering had entered or attempted to enter his vehicle.  Mr. Howitt stated Mr. Pickering had never touched the door handles or windows, and the only time the man had touched the vehicle was when he bumped up against it.  However, he believed or envisioned the man would have tried to open the doors or break a window to reach in and grab him if he had not acted to defend himself.

[¶16]  Although he could not see the person, Mr. Howitt believed it was the intoxicated man he saw earlier in the night walking around the campground.  He could not see the man's face but could tell he was wearing a blue shirt.  Mr. Howitt heard a thud after he shot Mr. Pickering, and he did not hear any sounds indicative of Mr. Pickering attempting to move from where he fell.  Mr. Howitt got dressed, grabbed a flashlight, and shined the light on Mr. Pickering.  The only time Mr. Howitt saw Mr. Pickering in his campsite was after he shined the light on him; he assumed Mr. Pickering was in his campsite when he felt the vehicle rocking.

[¶17]  A deputy inspected Mr. Howitt's vehicle, which was very dirty on the outside, but the deputy did not observe any handprints on the vehicle.  He did see a small rub mark above the driver's side front fender, which was consistent with someone getting in and out of the vehicle.  He did not observe any smudge marks on the passenger side of the vehicle.

[¶18]  The State charged Mr. Howitt with aggravated assault and battery in violation of Wyoming Statute § 6-2-502.  Mr. Howitt filed a motion to dismiss, asserting he had acted in self-defense and was immune from prosecution under Wyoming Statute § 6-2-602(f).  The district court conducted an evidentiary hearing on the motion to dismiss as required by *State v. John*, 2020 WY 46, 460 P.3d 1122 (Wyo. 2020).  Following that hearing, the trial court entered an order denying the motion to dismiss.  The district court found Mr. Howitt was not entitled to "self-defense immunity" because he "failed to make a *prima facie* showing that Mr. Pickering was in the process of unlawfully and forcefully entering Mr. Howitt's habitation."

[¶19]  Mr. Howitt did not testify at the trial, but several witnesses testified about statements Mr. Howitt made on the night of the incident.  In addition, the videos of his statements to law enforcement were played for the jury.  Mr. Howitt argued he shot Mr. Pickering in self-defense.  He asked the court to give numerous jury instructions setting forth the law on self-defense.  The State objected to giving any self-defense instructions because Mr. Howitt had not made a prima facie showing of self-defense.  The district court found Mr. Howitt made such a showing, and gave the general self-defense instruction,[2] along with the

---

[2] This instruction read:

> The State must prove beyond a reasonable doubt that the Defendant did not act in self-defense.  Self-defense is a right that can be exercised only when the person employing it has the right to do so at the moment it is used.  Whether he has that right depends on what is

4

definition of "serious bodily injury." Additionally, it determined the jury should receive instructions on determining who was the first aggressor, how an initial aggressor could regain the right of self-defense, and the definition of reasonable force. Finally, the district court instructed the jury that if it determined Mr. Pickering was the initial aggressor, Mr. Howitt did not have a duty to retreat before using reasonable force against him.

[¶20] Mr. Howitt also asked the court to give two "castle doctrine" instructions. Proposed instruction 7 read:

> A person who unlawfully and by force enters or attempts to enter another's home or habitation is presumed to be doing so with the intent to commit an unlawful act involving force or violence.
>
> Habitation means any structure which is designed or adapted for overnight accommodations, including, but not limited to, buildings, modular units, trailers and campers and tents, but does not include the inmate housing area of a jail, state penal institution, or other secure facility under contract with the Department of Corrections to house inmates.
>
> Home means any occupied residential dwelling place.

The State objected to this instruction, stating:

> There has been absolutely no evidence in the State's case or defense's case that indicates that there was any person who, by force or attempt, was entering the home or habitation. I think [the] Defendant's statements alone say that he never felt him pull on the door handle, never broke a window, but that the Defendant envisioned that that could be a result of something.

The State also argued "there's no authority interpreting the definition of habitation to include vehicles and no authority supporting claims that a vehicle may be adapted for overnight accommodation simply by choosing to sleep in it."

---

reasonably necessary under all the circumstances.

To determine what is reasonably necessary you must determine whether the Defendant reasonably perceived a threat of imminent death or serious bodily harm under the circumstances. If the Defendant reasonably and honestly believed that he was in imminent danger of death or serious bodily harm and the force used was necessary to repel that danger, he may have been entitled to self-defense. The perceived danger may have been real, apparent, or later determined to be false.

[¶21]  Mr. Howitt's counsel argued the court should give the instruction:

> I think the defense has shown that if the Defendant had not discharged that firearm we have the -- Mr. Pickering making his way towards the Defendant in an effort to gain entry and make contact with the Defendant and therefore it meets the requirement of attempts to enter another's home or habitat [sic].  Yes, the jury instruction that we just read doesn't say SUV, but it goes between a camper and a tent and somewhere in between I think we can say a vehicle if it's converted to a place to sleep, the habitat [sic], it qualifies, so we ask the Court to allow for that instruction.

The district court found it was not appropriate to give the proffered instruction:

> I definitely agree there's some argument to be made either way regarding habitation and an SUV.  This clearly was converted into a sleeping arrangement for Mr. Howitt, there's no debate there, however, I agree with the State that neither -- none of the evidence presented suggests that Mr. Pickering was unlawfully entering or by force entering or attempting to enter the vehicle. We have clear statements from Mr. Howitt that he never -- Mr. Pickering never touched the door handle. He may have been -- Mr. Howitt may have anticipated that Mr. Pickering would do that, but that's not the standard here.  There has to be an attempt, and under the circumstances and the evidence that we have, we do not even have an attempt to enter.  So instruction number 7 will not be given.

[¶22]  Mr. Howitt also asked the court to give proposed instruction number 8, which read:

> If the evidence shows that, one, Drew Pickering was in the process of unlawfully and forcibly entering a home or habitation; and, number two, John Howitt knew or had reason to believe that an unlawful and forcible entry or an unlawful forcible act was occurring, then you shall presume that the Defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily injury and that force was necessary to repel that danger.

The State objected to this instruction on the grounds that there was "no evidence that Drew Pickering was in the process of unlawfully or forcibly entering a home or habitation."  Mr.

6

Howitt's counsel made the same argument as he had for instruction number 7. The district court found: "[I]nstruction number 8 will not be given because there is no evidence that Mr. Pickering was in the process of unlawfully and forcibly entering a home or habitation."

[¶23] The jury convicted Mr. Howitt of aggravated assault and battery. Using a special verdict form, the jury unanimously found Mr. Howitt did not act in self-defense. The district court sentenced Mr. Howitt to prison for not less than four nor more than eight years. This appeal timely followed.

## STANDARD OF REVIEW

[¶24] "The failure to give an offered instruction on the law related to a theory of defense is a due process issue, which this Court reviews de novo." *Smith v. State*, 2021 WY 28, ¶ 25, 480 P.3d 532, 538 (Wyo. 2021) (quoting *Black v. State*, 2020 WY 65, ¶ 22, 464 P.3d 574, 579 (Wyo. 2020)). "[T]he question of whether the court invaded the province of the jury by making a factual determination" is a legal question that we also review de novo. *Widdison v. State*, 2018 WY 18, ¶ 15, 410 P.3d 1205, 1211 (Wyo. 2018) (citing *Weinstein v. Beach*, 2014 WY 167, ¶¶ 8–9, 340 P.3d 1013, 1016 (Wyo. 2014); *K.C. v. State*, 2011 WY 108, ¶ 7, 257 P.3d 23, 25–26 (Wyo. 2011)).

## DISCUSSION

[¶25] Wyoming has long recognized the "castle doctrine" which holds "a person is not required to retreat and may stand his ground and kill his assailant if he is assaulted, without fault, in his own home." *Drennen v. State*, 2013 WY 118, ¶ 24, 311 P.3d 116, 125 (Wyo. 2013) (citing *Palmer v. State*, 59 P. 793 (Wyo. 1900))[3] "In Wyoming, a person has a greater right to use self-defense within one's 'home or habitation.'" *Knospler v. State*, 2016 WY 1, ¶ 23, 366 P.3d 479, 485 (Wyo. 2016) (citing Wyo. Stat. Ann. § 6-2-602). "Home" and "habitation" are defined as:

> (i) "Habitation" means any structure which is designed or adapted for overnight accommodation, including, but not limited to, buildings, modular units, trailers, campers and tents, but does not include the inmate housing area of a jail, state penal institution or other secure facility under contract with the department of corrections to house inmates;
>
> (ii) "Home" means any occupied residential dwelling place other than the inmate housing area of a jail, state penal

---

[3] This principle was based on the idea that "a man's home is his castle and he has the right to defend his family and himself therein." *Drennen*, ¶ 24 n. 4, 311 P.3d at 125 (citing D. Drake, *The Castle Doctrine: An Expanding Right To Stand Your Ground*, 39 St. Mary's L.J. 573 (2008)).

7

institution or other secure facility under contract with the department of corrections to house inmates;

Wyo. Stat. Ann. § 6-2-602(g)(i)–(ii) (LexisNexis 2021). The castle doctrine establishes certain rebuttable presumptions that apply when defensive force is used against someone who was in the process of unlawfully and forcefully entering a home or habitation:

> (b) A person is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to himself or another when using defensive force, including deadly force if:
>
>> (i) The intruder against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, another's home or habitation or, if that intruder had removed or was attempting to remove another against his will from his home or habitation; and
>>
>> (ii) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring.

Wyo. Stat. Ann. § 6-2-602(b) (LexisNexis 2021).

[¶26]  Mr. Howitt asserts the district court erred when it refused to give his proposed castle doctrine instructions that would have informed the jury about these presumptions. He alleges "[t]here was evidence in the record which the jury could have interpreted to support [his] defense that Mr. Pickering was 'in the process' of breaking into Mr. Howitt's SUV when Mr. Howitt resorted to using force." He claims the question of whether Mr. Pickering was in the process of unlawfully and forcefully entering Mr. Howitt's vehicle was a question of fact that should have been resolved by the jury. The State argues the district court correctly refused the castle doctrine instructions, for two reasons: 1) Mr. Howitt's vehicle does not meet the definition of home or habitation; and 2) the evidence did not show Mr. Pickering was in the process of unlawfully and forcefully entering Mr. Howitt's vehicle.

[¶27]  "A proper theory of defense instruction must 'sufficiently inform the jury of the theory of defense,' and there must be 'competent evidence' to support that theory of defense." *Harnetty v. State*, 2019 WY 21, ¶ 29, 435 P.3d 368, 374 (Wyo. 2019) (quoting *Bruce v. State*, 2015 WY 46, ¶ 79, 346 P.3d 909, 932 (Wyo. 2015)). We have said:

> Any competent evidence is sufficient to establish a defense theory even if it consists only of testimony of the defendant.

8

> We view the evidence in a light favorable to the accused and the accused's testimony must be taken as entirely true to determine if the evidence is competent. Even if the court deems the evidence to be weak, or unworthy of belief, the instruction must be given if a jury could reasonably conclude the evidence supports the defendant's position.

*Smith,* 2021 WY 28, ¶ 25, 480 P.3d at 538 (internal citations omitted) (quoting *Black*, 2020 WY 65, ¶ 22, 464 P.3d at 579–80).

> The quantum of evidence required to submit [a theory of] defense to a jury has been described as 'any evidence,' 'some evidence,' 'slight evidence,' and 'more than a scintilla.' . . . [T]hese phrases are not useful because the ultimate test is whether the evidence (regardless of amount) creates a fact issue requiring submission to the jury.

*Black*, ¶ 24, 464 P.3d at 580 (citing *United States v. Ortiz*, 804 F.2d 1161, 1166 n. 4 (10th Cir. 1986)). A theory of defense instruction should be given "if the jury could reasonably conclude the evidence supports the defendant's position." *Tingey v. State*, 2017 WY 5, ¶ 40, 387 P.3d 1170, 1181 (Wyo. 2017). An erroneous refusal to give "a theory of defense instruction is 'reversible error per se.'" *Smith*, ¶ 25, 480 P.3d at 538 (quoting *Black*, ¶ 22, 464 P.3d at 579).

[¶28]   Although the trial court must determine if there is competent evidence in the record to support giving the proposed theory of defense instructions, it must not invade the province of the jury by resolving factual questions. "Criminal defendants are entitled to a jury trial with the jury as the sole fact-finder." *Widdison*, 2018 WY 18, ¶ 21, 410 P.3d at 1213 (quoting *Snow v. State*, 2009 WY 117, ¶ 28, 216 P.3d 505, 514 (Wyo. 2009)). We have "consistently emphasized the principle that the jury—not the trial court and not the attorneys—resolves factual issues." *Id.* (citations omitted). Where the evidence regarding the proposed defense is conflicting, the question is one for the jury. *Black*, 2020 WY 65, ¶ 24, 464 P.3d at 580 (citing *Nelson v. State*, 2010 WY 159, ¶ 22, 245 P.3d 282, 287 (Wyo. 2010)).

[¶29] In *Widdison*, there was conflicting evidence in the record about whether the defendant resided in the home where the killing took place. 2018 WY 18, ¶ 20, 410 P.3d at 1213. The trial court took it upon itself to make a "judgment call" on this conflicting evidence, and it decided the evidence did not support giving a castle doctrine instruction. *Id.* at ¶¶ 17–20, 410 P.3d at 1212–13. We reversed and found this "judgment call" invaded the fact-finding province of the jury. *Id.* at ¶¶ 22–23, 410 P.3d at 1213. We held the determination of whether the victim's home was the defendant's residence was a question of fact that had to be answered by the jury. *Id.*

[¶30]   In this case, when deciding whether to give the castle doctrine instructions, the trial court had to determine if there was competent evidence in the record that created factual questions about whether Mr. Howitt's vehicle was a habitation and whether Mr. Pickering was in the process of unlawfully and forcefully entering that habitation.[4]  We review each of these questions de novo to decide whether the district court committed legal error by removing factual questions from the jury's consideration.

> **I.     Was there competent evidence that would allow a jury to conclude Mr. Howitt's vehicle was a "habitation"?**

[¶31]   The State contends we should affirm the trial court's decision on the grounds that vehicles do not fall within the statutory definition of habitation.  As support for this argument, the State cites our decision in *Knospler*.  In *Knospler*, the defendant was sleeping in his vehicle after he was asked to leave a bar. 2016 WY 1, ¶ 3, 366 P.3d at 481. Approximately an hour and a half later, the victim exited the bar and approached the defendant's vehicle, believing it belonged to his friends. *Id.*  The victim pulled on the passenger door handle and knocked on the window, before walking around to the driver's side and leaning on the door. *Id.*  The defendant shot and killed the victim. *Id.*  The defendant asked the court to give castle doctrine instructions. *Id.* at ¶ 9, 366 P.3d at 482. The district court declined to give the proffered instructions. *Id.* at ¶ 21, 366 P.3d at 485. We affirmed the district court's decision because the defendant "provide[d] no authority interpreting the statutory definition of 'habitation' to include vehicles, and no authority supporting his claim that a vehicle may be 'adapted' for overnight accommodation simply by choosing to sleep in it." *Id.* at ¶ 23, 366 P.3d at 485.

[¶32]   The definition of habitation includes "any structure" that has been "adapted for overnight accommodation," including tents and campers. Wyo. Stat. Ann. § 6-2-602(g)(i). The word vehicle is not expressly included in this definition. *Id.*  However, the list contained in the definition is representative, not exhaustive, as evidenced by the use of the words "including, but not limited to." *Id.*  This statute "should be construed to apply to the same general kind or class as those specifically listed." *Yager v. State*, 2015 WY 139, ¶ 19, 362 P.3d 777, 782 (Wyo. 2015) (quoting *RME Petroleum Co. v. Wyo. Dep't of Revenue*, 2007 WY 16, ¶ 46, 150 P.3d 673, 689–90 (Wyo. 2007)).  Whether a vehicle has been adapted for overnight accommodation, such that it could fall under the definition of habitation, becomes a question of fact for the jury once the trial court determines there is competent evidence in the record that would allow a jury to conclude such adaptations were made.

---

[4] At trial, Mr. Howitt also proposed instruction number 7 based on Wyo. Stat. Ann. § 6-2-602(d) (LexisNexis 2021).  However, he does not focus his appeal on this proposed instruction.  Accordingly, we decline to address this subsection of the statute.

[¶33]  We recognize in *Knospler* we affirmed the district court's decision not to recognize the vehicle as a home or habitation.  However, the facts in this case are distinguishable from those in *Knospler*.  In this case, it is undisputed Mr. Howitt had been living out of his vehicle for several days.  He had cleared out the passenger side and folded down the back seat so that he could sleep in his vehicle.  The district court correctly found there was competent evidence in the record to create a factual question about whether Mr. Howitt's vehicle was a "habitation" because it had been adapted for overnight accommodation.

## II.  Was there competent evidence that Mr. Pickering was in the process of unlawfully and forcefully entering Mr. Howitt's habitation?

[¶34]  In this case, it is undisputed that Mr. Pickering never entered Mr. Howitt's vehicle.  Mr. Howitt would only have been entitled to instructions on the castle doctrine presumptions set forth in Wyoming Statute § 6-2-602(b) if there was competent evidence to show Mr. Pickering was in the process of unlawfully and forcefully entering Mr. Howitt's habitation.  "In the process of" is not defined in the statute.  "When a statute does not provide a technical definition of a word, the ordinary definition of the word generally applies." *Dugan v. State*, 2019 WY 112, ¶ 31, 451 P.3d 731, 741 (Wyo. 2019) (citing *Cecil v. State*, 2015 WY 158, ¶ 14, 364 P.3d 1086, 1090–91 (Wyo. 2015)); *see also Ewing v. State*, 2007 WY 78, ¶¶ 9–10, 157 P.3d 943, 945–46 (Wyo. 2007) (stating when a term is not defined in the statute, it suggests the legislature did not intend to give it a specialized meaning).  "A term must only be defined if the correct legal definition is such a departure from ordinary meaning that the jury would misunderstand its application to the circumstances before it." *Ewing*, ¶ 9, 157 P.3d at 946 (citing *Wilson v. State*, 14 P.3d 912, 916 (Wyo. 2000)).  We find the term "in the process of" as used in this statute does not have a technical meaning outside of its ordinary connotation. *See Ewing*, ¶ 10, 157 P.3d at 946.  Mr. Howitt asks us to find the phrase "in the process of . . . encompasses a spectrum of activity."  We have not yet explored what types of conduct fall within this phrase.  However, courts in other jurisdictions with similar statutes have done so, and we find those cases instructive for the application of our statute.

[¶35]  In *State v. Duncan*, the Supreme Court of South Carolina had to determine whether the victim was in the process of entering the defendant's home when he was shot. 709 S.E.2d 662, 663 (S.C. 2011).[5]  The victim was a guest in the defendant's home, but he was

---

[5] The relevant portion of South Carolina's self-defense statute states:

> (A) A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury to himself or another person when using deadly force that is intended or likely to cause death or great bodily injury to another person if the person:
>
> > (1) against whom the deadly force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcibly entered a dwelling, residence, or occupied vehicle, or if he

asked to leave after making inappropriate comments about the defendant's daughter. *Id.* at 663. The victim left but returned a short time later. *Id.* The victim opened the screened porch door of the defendant's home, advanced across the porch, and tried to force his way onto the porch despite a third party's attempts to get him to leave. *Id.* The defendant shot and killed the victim. *Id.* The Supreme Court of South Carolina upheld the trial court's decision that the defendant was immune from prosecution because the evidence showed the victim was in the process of unlawfully and forcefully entering the defendant's home. *Id.* at 665.

[¶36] In *Commonwealth v. Cannavo*, the Superior Court of Pennsylvania was asked to determine if the victim was in the process of entering the defendant's home or habitation when he was shot. 199 A. 3d 1282 (Pa. Super. Ct. 2018).[6] The defendant was staying in a carriage house on Halloween night. *Id.* at 1285. The victim and his friends went "out on the town" wearing Halloween costumes, and they became intoxicated. *Id.* They tried to enter a party that was being held near the carriage house, but they were denied entry. *Id.* The victim then began banging on the door of the carriage house. *Id.* at 1285–86. The defendant fired a shot at the door, without opening it. *Id.* at 1286. The victim survived, and the defendant was charged with attempted murder, aggravated assault, recklessly endangering another person, and simple assault. *Id.* at 1285. The defendant asked the court for castle doctrine instructions. *Id.* at 1286. The trial court declined to give the instructions and found:

> No evidence whatsoever, express or implied, was presented at

_____

> removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle; and
> (2) who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred.

S.C. Code Ann. § 16-11-440 (2022).

[6] The relevant portion of Pennsylvania's self-defense statute reads:

> (2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:
>> (i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.
>> (ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

18 Pa. Stat. and Cons. Stat. Ann. § 505 (West 2022).

trial that the victim himself . . . was attempting to gain entry to the carriage house at the time he was shot . . . . The only "evidence" that the victim was attempting to break into the carriage house is [defendant's] uncorroborated testimony of his personal, subjective belief that the victim was attempting to break in. . . .

*Id.* at 1288–89 (citing Trial Ct. Op., filed 12/19/17, at 5-6). The Superior Court of Pennsylvania found the trial court's refusal to give the instruction was proper. *Id.* at 1289. It found the defendant's subjective belief only applied to whether he knew the entry had occurred, and it did not show the victim was in the process of unlawfully and forcefully entering the carriage house. *Id.* The defendant would have been entitled to a castle doctrine instruction "only if evidence was actually presented of the victim's unlawful and forceful attempt to enter the carriage house." *Id.*

[¶37] In *Commonwealth v. Brockington*, the Superior Court of Pennsylvania had to decide if someone was in the process of entering the defendant's home when defensive force was used. 230 A. 3d 1209 (Pa. Super. Ct. 2020). In that case, the defendant heard noises outside the front of her home early in the morning. *Id.* at 1212. She exited her house and fired a single shot up in the air. *Id.* No one was injured, but she was charged with possession of the instrument of a crime and recklessly endangering another person. *Id.* at 1211. She argued she had acted in self-defense and was entitled to invoke the castle doctrine. *Id.* at 1212–13. At the trial, the defendant testified that several months before the events at issue, she had heard someone "scratching" on the screen door to her cellar. *Id.* at 1214. She was not sure who it was, but she thought it might be her neighbor's son. *Id.* The neighbors denied the allegations. *Id.* The defendant also testified that someone caused damage to her home resulting in a split in the front of the house, a dented pole, and damaged concrete. *Id.* When she awoke on the night in question, she could hear "them" outside. *Id.* Although she could not see them, she thought a bunch of young kids were outside, and they would run off after she fired the shot. *Id.* The Pennsylvania Superior Court found the defendant's "testimony did not show that she knew or had reason to believe that an individual had unlawfully entered or was in the process of unlawfully entering her dwelling when she shot the firearm." *Id.* (citing 18 Pa. C.S. § 505(b)(2.1)).

[¶38] In *State v. Dilworth*, the Court of Appeals for North Carolina had to decide if the victim was in the process of entering the curtilage[7] of the defendant's home when he was

---

[7] North Carolina's statute defines home as: "A building or conveyance of any kind, to include its curtilage, whether the building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it, including a tent, and is designed as a temporary or permanent residence. N.C. Gen. Stat. Ann. § 14-51.2(a)(1) (2019). Wyoming's definitions of home and habitation do not specifically include the curtilage of the structure. Wyo. Stat. Ann. § 6-2-602(g)(i)–(ii).

stabbed. 851 S.E.2d 406 (N.C. Ct. App. 2020).[8]  In that case, the defendant repeatedly stabbed a man who was riding an ATV on property that was adjacent to the defendant's property. *Id.* at 407.  The defendant told the investigators he heard loud noises outside his home and stepped outside to see what was going on. *Id.* at 408.  The defendant claimed the victim had been riding an ATV on his property, close to his home. *Id.*  However, the area where the attack occurred was outside of the defendant's property line. *Id.*  The defendant admitted he did not know where the property line was. *Id.*  The defendant was charged with assault with a deadly weapon inflicting serious injury. *Id.* at 407.  He asked the trial court to give castle doctrine instructions. *Id.* at 409.  The trial court declined to give the instructions because the attack occurred outside the curtilage of the defendant's home. *Id.* On appeal, the defendant argued the evidence was sufficient to support giving the instruction because he believed the victim "to be unlawfully on his property at the time of the attack." *Id.* at 410.  The Court of Appeals of North Carolina affirmed the trial court's decision and concluded the defendant "presented no actual evidence [the victim] was in the process or had actually unlawfully and forcibly entered his home." *Id.* at 411.  Although the defendant "felt like" the victim was on his property, this would only support a determination the defendant "had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred," and there was "simply no evidence [the victim] was in fact 'in the process of unlawfully and forcefully entering, or had unlawfully and forcefully entered, a home.'" *Id.* at 411 (citing N.C. Gen. Stat. § 14-51.2(b)(1)).

[¶39]   Turning to the facts of this case, we view the evidence in the light most favorable to Mr. Howitt and accept all his statements as true. *Smith*, 2021 WY 28, ¶ 25, 480 P.3d at 538 (quoting *Black*, 2020 WY 65, ¶ 22, 464 P.3d at 579–80).  Based on the cases cited above, Mr. Howitt's personal, subjective belief that Mr. Pickering was going to enter his vehicle, standing alone, would be insufficient to support giving a castle doctrine instruction. However, there was other evidence in the record that, if believed, would create a factual

---

[8] The relevant portion of North Carolina's self-defense statute reads:

> (b) The lawful occupant of a home, motor vehicle, or workplace is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
> > (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home, motor vehicle, or workplace, or if that person had removed or was attempting to remove another against that person's will from the home, motor vehicle, or workplace.
> > (2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

N.C. Gen. Stat. Ann. § 14-51.2 (2019).

question about whether Mr. Pickering was in the process of unlawfully and forcefully entering Mr. Howitt's habitation.

[¶40] Mr. Pickering's actions in this case fall in between those of the victim in *Duncan* and those of the victims in *Cannavo*, *Brockington,* and *Dilworth*. Mr. Howitt told several witnesses that Mr. Pickering threatened to come over and assault him. Mr. Howitt repeatedly told Mr. Pickering not to come any closer. According to Mr. Howitt's statements, despite these warnings, Mr. Pickering aggressively lunged at or approached Mr. Howitt's vehicle. Mr. Howitt told law enforcement that Mr. Pickering did not touch any of the doors or windows, and the only time Mr. Pickering made contact with Mr. Howitt's vehicle was when he bumped against it before any words were exchanged. However, he told other witnesses that Mr. Pickering had been knocking on the window of his vehicle while threatening to "beat the sh*t out of him." Mr. Pickering was within the gravel area of Mr. Howitt's campsite when he was shot, which could support Mr. Howitt's claim that he heard Mr. Pickering pick up speed as he approached the vehicle. The jury, not the district court, should have been given the opportunity to determine which of Mr. Howitt's statements were credible. Although the evidence about Mr. Pickering knocking on the windows or lunging toward the vehicle may be weak or unworthy of belief, a jury could reasonably conclude this evidence supports Mr. Howitt's position that Mr. Pickering was in the process of unlawfully and forcefully entering his vehicle. The trial court should have allowed the jury to resolve this factual question.

[¶41] We find the record contains facts from which a jury could have concluded Mr. Pickering was in the process of unlawfully and forcefully entering Mr. Howitt's habitation. After thoughtfully and thoroughly examining the record, the dissent reached the opposite conclusion. This illustrates the fact-intensive nature of this inquiry and highlights the need for this factual question to be resolved by the jury.

[¶42] In *Widdison* we stated: "[t]he determination whether [the victim's] home was [the defendant's] residence was a question that had to be answered before the jury could have been instructed on the castle doctrine." 2018 WY 18, ¶ 23, 410 P.3d at 1213. This language should not be read as requiring the trial court to bifurcate the proceedings and have the jury determine the factual questions surrounding the castle doctrine before the court determines what self-defense instructions to give. The trial court has the discretion to determine the best method for allowing the jury to resolve factual questions surrounding the castle doctrine. A trial court may choose to bifurcate the proceedings or use instructions and a detailed special verdict form to allow the jury to resolve all the factual questions raised by the evidence.

## CONCLUSION

[¶43] Mr. Howitt presented competent evidence to create factual issues about whether his vehicle was adapted for overnight accommodation and fit within the definition of a

15

habitation and whether Mr. Pickering was in the process of unlawfully and forcefully entering that habitation when he was shot. The district court should have allowed these factual questions to be resolved by the jury. We reverse and remand for a new trial.

**KAUTZ, J., dissenting, in which FOX, C.J., joins.**

[¶44]  I respectfully dissent from the proposed majority opinion.

[¶45]  This case requires interpretation of the language in Wyo. Stat. Ann. § 6-2-602 (LexisNexis 2021) which codifies the law of self-defense and the castle doctrine.

> (a) The use of defensive force whether actual or threatened, is reasonable when it is the defensive force that a reasonable person in like circumstances would judge necessary to prevent an injury or loss, and no more, including deadly force if necessary to prevent imminent death or serious bodily injury to the person employing the deadly force or to another person. . . .
>
> (b) A person is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to himself or another when using defensive force, including deadly force if:
>
> (i) The intruder against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, another's home or habitation . . . and
>
> (ii) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring. . . .

Section 6-2-602(a) & (b).

[¶46]  As the majority recognizes, Mr. Howitt restricts his appellate argument to Proposed Instruction 8[9]:

> If the evidence shows that, one, [the victim] was in the process of unlawfully and forcibly entering a home or habitation; and, number two, [Mr.] Howitt knew or had reason to believe that an unlawful and forcible entry or an unlawful forcible act was occurring, then you shall presume that [Mr. Howitt] honestly and reasonably believed that he was in imminent danger of

---

[9] Mr. Howitt did not focus his appeal on the presumption listed in his Proposed Instruction 7.  Because we appropriately do not address that presumption in this opinion, no conclusion should be drawn as to whether that presumption has any bearing on self-defense or on the castle doctrine.

death or serious bodily injury and that force was necessary to repel that danger.

[¶47]   The majority opinion does not find the statutory language ambiguous, and it is not. It is entirely plain and unambiguous.  We should rely on the plain meaning of the words and phrases the legislature used.  *See Ailport v. Ailport,* 2022 WY 43, ¶ 22, 507 P.3d 427, 437 (Wyo. 2022) ("If the [statutory language] is sufficiently clear and unambiguous, the Court simply applies the words according to their ordinary and obvious meaning.") (citations and quotation marks omitted).

[¶48]   The plain meaning of "in the process of" is "working on (doing something) that takes a certain amount of time to do[.]" https://www.merriamwebster.com.  The plain meaning of "forcefully enter" is "to go into" "in a forceful, powerful or emphatic manner." https://www.merriam-webster.com/dictionary/forcefully   and   https://www.merriam-webster.com/dictionary/enter.   Under these definitions, it was appropriate to give the statutory castle doctrine instruction only if there was evidence the victim was going into, i.e., entering, Mr. Howitt's vehicle.  Subsection 6-2-602(b)(ii) reinforces the necessity of a physical effort to enter before the castle doctrine applies by requiring that the defendant knew or had reason to believe "an unlawful and forcible entry . . . **was occurring**." (Emphasis added).

[¶49]   As the majority recognizes, the facts show the victim neither entered nor made an effort to enter Mr. Howitt's vehicle.  The majority also acknowledges in Paragraph 40 that Mr. Howitt's subjective belief the victim would attempt to enter the vehicle was clearly insufficient to warrant instructing the jury on the castle doctrine.  What the facts show is he never grabbed the door handle, attempted to break the windows, or otherwise tried to gain entry in any manner, much less in a forceful manner.  Being in the vicinity of the car, knocking on the windows, bumping the car, and engaging in verbal threats all are insufficient to establish the victim was working on or attempting to enter Mr. Howitt's vehicle.  Even if the victim "lunged," as Mr. Howitt claimed, that act does not constitute entry, or even an attempted entry.  Furthermore, when the shooting occurred, the victim was not doing any of those things.

[¶50]   The Pennsylvania cases cited by the majority actually support the district court's decision to refuse Mr. Howitt's request for a castle doctrine instruction.   In *Commonwealth v. Brockington,* 230 A.3d 1209, 1212 (Pa. Super. Ct. 2020), the defendant shot into the air when she heard someone making noises outside her home.  In the past, she had heard scratching on her cellar door and someone had damaged the front of her house.  *Id.* at 1214.  The Pennsylvania court found, as a matter of law, the defendant was not entitled to a castle doctrine instruction because the evidence was insufficient to show anyone was "in the process of unlawfully and forcefully" entering the defendant's house.  *Id.*  This case demands the same result.  Mr. Howitt may have

18

heard knocking on his windows or felt his vehicle rocking, but none of that relates to any ongoing effort by the victim to enter the vehicle.

[¶51]   In *Commonwealth v. Cannavo,* 199 A.3d 1282, 1285 (Pa. Super. Ct. 2018), the victim and his friends, all of whom had been drinking in celebration of Halloween, tried to join "what they believed to be a party around [the defendant's] house, but were denied entry.  The victim, and possibly others, subsequently banged on [the defendant's] door," making repeated loud strikes.  The defendant saw them on his security camera and shot the victim through the door.  *Id.*  The defendant claimed he acted in self-defense and requested the trial court instruct the jury on the castle doctrine.  *Id.* at 1286.  The Pennsylvania court agreed with the trial court's conclusion that "[n]o evidence whatsoever, express or implied, was presented at trial that the victim . . . was attempting to gain entry to the [defendant's] house at the time he was shot."  *Id.* at 1288.  The victim in *Cannavo* was at least still at the door immediately after the loud banging occurred.  In this case, even if the victim had knocked on the windows and rocked Mr. Howitt's vehicle, he had moved away when Mr. Howitt shot.  Again, this case demands the same conclusion and result as the Pennsylvania court reached in *Cannavo* — the statutory castle doctrine could not apply because there was no evidence the victim was in the process of forcefully entering the vehicle when Mr. Howitt shot him.  *C.f., State v. Duncan,* 709 S.E.2d 662, 663, 665 (S.C. 2011) (the castle doctrine immunized the defendant from prosecution for shooting a person who forced his way onto the porch of the defendant's home).

[¶52]   The majority states "[a]lthough the evidence about Mr. Pickering knocking on the windows or lunging towards the vehicle may be weak or unworthy of belief, a jury could reasonably conclude this evidence supports Mr. Howitt's position that Mr. Pickering was in the process of unlawfully and forcefully entering his vehicle."  I disagree.  If a jury so concluded, it would be speculating.  There would be no evidence from which it could rationally reach that conclusion.  A defendant is entitled to theory of defense instructions "only if there is competent evidence in the record to support them."  *Patterson v. State,* 682 P.2d 1049, 1050 (Wyo. 1984).  "[A]n instruction should not be given based on evidence which at best raises a possibility or conjecture, or which is inconsistent with the physical facts."  *Id.*  In *Iseli v. State,* 2007 WY 102, ¶¶ 10, 18-20, 160 P.3d 1133, 1136, 1138-39 (Wyo. 2007), the district court properly refused to give the defense's proposed self-defense instructions because there was no version of the facts of the case which supported the theory of defense.  The same is true here.  There is no version of the facts which supports Mr. Howitt's theory that the victim was in the process of forcefully entering his vehicle.

[¶53]   In Paragraph 41, the majority mentions the victim's location within the gravel area of Mr. Howitt's campsite as a salient fact based on *State v. Dilworth,* 851 S.E.2d 406 (N.C. Ct. App. 2020).  *Dilworth* is completely inapplicable to this case.  It applies a North Carolina statute which extends a statutory castle doctrine to trespassers within the curtilage of a home.  *Id.* at 410.  Wyoming's statute does not apply the castle doctrine to trespassers in a curtilage.

[¶54]  The effect of the majority opinion is to greatly expand the castle doctrine statute in Wyoming.  It permits juries to find defendants can use deadly force even though no one is in the process of entering a home, but only knocks on a window, makes a verbal threat, or stands outside.  The majority's approach ignores the statutory limitation of the castle doctrine presumption to circumstances when someone is in the process of unlawfully and forcefully entering a home or habitation and permits juries to apply that presumption in speculative circumstances.  That simply is not what our statute provides.

[¶55]  Because there was no evidence showing the victim was in the process of unlawfully and forcefully entering Mr. Howitt's vehicle when Mr. Howitt shot him, the trial court correctly refused to give the castle doctrine instruction.